**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil Action   1:17-cv-00006 (BR) |
| Plaintiff, | ORDER GRANTING PLAINTIFF'S MOTIONS TO STRIKE AND FOR SUMMARY JUDGMENT ON LIABILITY AND RELATED MOTIONS |
| v. | |
| ROBERT BRACE, ROBERT BRACE FARMS, INC., AND ROBERT BRACE AND SONS, INC., | |
| Defendants. | |

## I.     INTRODUCTION

The United States of America initiated this action against Defendants Robert Brace, Robert Brace Farms, Inc. and Robert Brace and Sons, Inc.'s (collectively, "Defendants"), alleging that Defendants have repeatedly violated Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a), and seeking injunctive relief as well as civil penalties pursuant to the Act.  The following motions are currently before the Court: (1) the United States' motion to strike Defendants' response to the United States' motion for summary judgment on liability (Dkt. No. 154); (2) the United States' motion for summary judgment on liability (Dkt. No. 83); and (3) several motions in *limine* (Dkt. Nos. 82, 86, 87).

Having reviewed the motions, the oppositions thereto, the record of this case, as well as the relevant legal authorities, the Court will: (1) grant the United States' motion to strike Defendants' response to the summary judgment motion; (2) grant the summary judgment motion; and (3) strike as moot the remaining outstanding motions.  The reasoning for the Court's decision follows.

# I.     BACKGROUND

This case has a long and taxing history.  It arises from actions taken by Defendants dating back to the 1990s and continuing to the present with respect to two contiguous parcels of land owned by Defendants.  The complexity of the issues in this case, the volume of the record evidence, and the span of time have all led to the case's sloth-like progression.  However, the main cause of delay has been the dilatory and insolent behavior of Defendants.  Having repeatedly directed Defendants to comply with the Court's orders and the Federal Rules of Civil Procedure and having Defendants' repeatedly disregard opportunities to correct their behavior, the Court has reached its limit.  The Court will now exclude Defendants' undisclosed expert opinion and related exhibits and strike Defendants' over-length brief in opposition to the United States' summary judgment motion on liability.  Because the United States' summary judgment motion is now uncontested, the Court will grant the motion.

## A.  The Instant Action and the 1990 Action

As stated above, the United States initiated this lawsuit on January 9, 2017, seeking injunctive relief and civil penalties against Defendants for violating Section 301(a) of the CWA, by discharging pollutants into the waters of the United States, *see* Dkt. No. 1.  Broadly speaking, the United States charges Defendants with clearing statutorily protected wetlands located on a 20.01-acre plot of land, known as the "Marsh Site,"[1] in the townships of McKean and Waterford, Erie County, Pennsylvania.  *Id.* at ¶¶ 1, 28, 38.  The United States alleges that Defendants' actions caused dirt, rocks, and other debris—which the CWA defines as pollutants—to be discharged into the wetlands and adjoining Elk Creek, which in turn flows into Lake Erie.  *Id.* at

---

[1] The "Marsh Site" derives its name from the Marsh Family, James, Mardith, Ritchie Marsh, from whom, along with Virginia Sunberg and Linda Lorah, Robert Brace purchased the plot from in May 2012.  Dkt. No. 84 at ¶ 12; Dkt. No. 85 at 4.

¶¶ 31, 39, 47.  As the Defendants did not obtain a Section 404 permit for the discharge, *id.* at ¶ 41, the United States claims a CWA violation.

At the same time that the United States initiated the instant action, it also moved to enforce a consent decree that the parties entered into as part of another lawsuit filed in 1990 in the Western District of Pennsylvania (hereinafter "the 1990 Action").  *See United States v. Brace, et al.*, No. 90-229 (W.D. Pa. filed Oct. 4, 1990).  The Honorable Susan Paradise Baxter presides over the 1990 Action.  The 1990 Action involved another parcel of land—known as "the Murphy Site"—that is located just south of the Marsh Site.  Dkt. No. 84 at ¶¶ 5–11.[2]  The United States initiated the 1990 Action based on factual allegations similar to those alleged in the instant action, *i.e.*, that Defendants "cleared, mulched, churned, levelled, and drained the formerly wooded and vegetated" Murphy Site in order to make it suitable for farming.  *United States v. Brace*, 41 F.3d 117, 121 (3d Cir. 1994).  The district court dismissed the United States' complaint, concluding that Defendants' actions were exempt from the permitting requirements under the CWA.  *Id.* at 120.  The Third Circuit Court of Appeals reversed the district's decision and held that Defendants were liable of CWA violations and remanded the matter to the district court to assess penalties.  *See id.* at 130. Thereafter, the parties entered into a consent decree to resolve Defendants' liability.

On the same day that the United States initiated the instant action, it also filed a motion in the 1990 Action before Judge Baxter to enforce the consent decree.  Defendants moved to consolidate the 1990 Action and the instant action.  Dkt. No. 92.  The Court denied the motion on November 14, 2018.  Dkt. No. 120.  Nevertheless, Defendants have repeatedly attempted to

---

[2] The Court treats the United States' concise statement of undisputed material facts in support of its motion for summary judgment, Dkt. No. 84, as uncontested due to Defendants' inability to file a proper response.  *See infra* at 24–25.

intermingle the cases and the Court has had to repeatedly remind Defendants that the actions are separate and distinct from each other. *See* Dkt. No. 38 at 2; Dkt. No. 62 at 1–2; Dkt. No. 75 at 7; Dkt. No. 142 at 1 n.1, 5.

## B. Defendants' History of Non-Compliance with Court Orders and the Federal Rules of Civil Procedure in this Case

What followed the initiation of this action is a procedural history replete with extended deadlines, missed deadlines, and completely ignored deadlines—all by Defendants. In addition, Defendants have flagrantly disregarded the Federal Rules of Civil Procedure pleading requirements and this Court's instructions outlined in its Standing Order for Civil Cases. *See* Dkt. No. 41. And, when given repeated opportunities to reform their ways, instead of cleaning up their act, Defendants doubled down in their disregard for this Court's orders and instructions. Indeed, it taxes this Court's patience to recount the cycle of Defendants' misbehavior, Court-ordered compliance, and Defendants' disregard of such orders. Nevertheless, given the draconian nature of the sanction the Court will impose with this order, such a recitation is necessary.

Defendants' first misdeed was their failure to properly plead their affirmative defenses in the answer to the complaint. Dkt. No. 7. Defendants asserted eleven affirmative defenses, most of which failed to meet Federal Rule 8's pleading requirements. *Id.* at ¶¶ 54–64. The United States moved to strike eight of the eleven affirmative defenses, which this Court granted. In doing so, this Court noted that this case "span[s] at least six years" involving over 20 acres to which Defendants' "one-sentence paragraphs contain no particularities at all." Dkt. No. 40 at 2. "In a case of this magnitude," this Court went on, "such vague accusations cannot be expected to put the United States on notice." *Id.*

Next, the United States informed the Court that it was having a difficult time working

with Defendants to reach an agreed protocol for Electronically Stored Information ("ESI"), as they are required to do under Federal Rule 26(f). Dkt. No. 25. These difficulties included evasiveness from Defendants' counsel in answering emails, late replies, and attempts to include superfluous information and inappropriate discovery requests in the ESI protocol. *See generally id.* The United States, therefore, moved for entry of an order regarding discovery of ESI. *Id.*

While that motion was pending, Defendants moved for an extension to complete fact and expert discovery, alleging that they needed more time to complete and submit their rebuttal expert reports. They also claimed that more time was needed to allow them to complete the deposition of the respective expert witnesses. Dkt. No. 35. The United States objected claiming that Defendants had not shown good cause for the extension. Dkt. No. 36. On January 23, 2018, the Court adopted the United States' proposed ESI protocol and, over the United States' objection, granted Defendants' extension request. Dkt. No. 38.

Thereafter, on March 23, 2018, approximately three weeks *after* the already extended discovery deadline had passed, Defendants moved for another extension of the deadline, this time requesting a four-month extension. Dkt. No. 47. Defendants claimed that the extension was necessary so that they could produce an expert report on the hydrology of Defendants' land. The United States again objected the extension request. Dkt. No. 48. The Court granted Defendants' extension request for the limited purpose of producing the hydrology report. Dkt. No. 49. However, the Court warned Defendants that "[f]ailure to timely provide the Government with this expert report shall result in the Court prohibiting Defendants from using it at trial." *Id.*

The Court's admonishment obviously was not enough because Defendants did not provide the expert report to the United States until June 4, 2018; 10 days after it was due and with no explanation or attempt to extend the deadline. Dkt. No. 59 at ¶¶ 6–8. The United States

moved for an order to show cause as to why the expert report should not be stricken from the record; the Court granted the motion and ordered the Defendants to show cause as to why the report should not be excluded. Dkt. Nos. 59, 60. Ultimately, however, the Court accommodated Defendants yet again. In an order dated June 15, 2018, the Court declined to exclude the expert report, Dkt. No. 62. The United States moved for reconsideration, but this Court denied the motion. Dkt. Nos. 63, 67.

On June 25, 2018, the parties informed the Court that they had run into yet another discovery issue, and the Court scheduled a telephonic hearing for June 28, 2018. Dkt. No. 68. During that hearing, Defendants requested yet another extension to reopen and complete expert discovery. Dkt. No. 70. The Court denied the request. *Id.* In doing so, the Court noted that the extension request was made four weeks *after* the date by which discovery was to have closed (in violation of this Court's Standing Order, Dkt. No. 41). The Court further noted this was Defendant's third extension request. Lastly, the Court determined that Defendants had not established good cause for the extension. *Id.* at 6. The Court concluded the order by admonishing "the parties [to] work cooperatively in order to meet [the subsequently established] deadlines." *Id.* at 7.

Overtaken in this maelstrom, and its current recitation in this order, was Defendants' filing of their amended answer, Dkt. No. 44, and the United States' motion for partial judgment on the pleadings regarding Defendants' affirmative defenses, Dkt. No. 52. Defendants filed their opposition to the motion on May 7, 2018. Dkt. No. 55. In resolving the United States' motion, the Court first noted that Defendants' opposition relied on factual allegations not set forth in their amended answer and on evidence that is not part of the record in this case. Dkt. No. 75 at 6–8. Thus, the Court disregarded the previously unpled and/or unsubstantiated allegations and turned

to the merits of the motion. Based on those arguments, the Court granted the United States' motion for partial judgment and held that Defendants had failed to adequately state their affirmative defense, for a second time. *Id.* at 16–17.

On September 11, 2018, Defendants submitted another request for extension of time, this time to file dispositive and *Daubert* motions. Dkt. No. 80. The Court granted Defendants' request, extending the deadline to file such motions to no later than September 25, 2018. Dkt. No. 81. In doing so, the Court explicitly stated that it "expect[ed] that this will be the last such request from either party." *Id.*

## C. Current Pending Motions

On September 25, 2018, the United States submitted the currently pending motion for summary judgment on liability, along with a brief and a concise statement of material facts. Dkt. Nos. 83, 84, 85. The United States also timely submitted a motion in *limine* to exclude certain expert testimony. Dkt. No. 82.

The next day, September 26, 2018, Defendants submitted two motions in *limine* to exclude the United States' experts' testimony. Dkt. Nos. 86, 87. The astute reader will recall that the Court set the deadline for such motions as September 25, 2018 when the Court warned that it "expect[ed] that this will be the last such request from either party." Dkt. No. 81. The United States promptly moved to strike both filings as untimely, pointing out that Defendants filed their motions late, "(a) without explanation or acknowledgement, (b) without notifying the Court or seeking leave, (c) in spite of requesting the September 25 deadline just two weeks ago and acknowledging the deadline just days ago . . . and (d) knowing that this Court had warned the parties that it would not extend the deadline further." Dkt. No. 88 at ¶ 6 (internal citations removed).

Defendants, not surprisingly, opposed the government's motion. Dkt. No. 89. They

argued that their counsel—an alleged sole practitioner—"experienced [a] shortness of time" due to responsibilities to another client. *Id.* at 6. They also argued that the motions in *limine* were only late because local counsel refused to submit motions that exceeded the Court's page limitation. *Id.* at 6 n.4. Therefore, Defendants' counsel argued, he had to spend the next "24 uninterrupted hours" whittling down the motions. *Id.* at 5–6.

The Court was unpersuaded by Defendants' opposition to the United States' motion to strike. First, the Court noted that Defendants' untimely motions constituted Defendants' *third* untimely request that the Court modify its scheduling order. Dkt. No. 100 at 3. Second, the Court noted that "a number of Defendants' assertions stretch credulity," such as counsel's claim to be a "solo practitioner" when counsel's law firm website lists three attorneys. Further, counsel had assistance from co-counsel in this case who had "signed—and docketed—every defense pleading in [the] case." *Id.* at 3–4. Lastly, the Court held that, regardless of counsel's excuses, "it is well established that an attorney's busy schedule does not excuse untimely pleadings that violate court orders." *Id.* at 4 (listing cases). The Court also noted that, to the extent that Defendants argued that their motion should be considered timely because their counsel "timely finished what he believed to be the final versions of the motions," the Court was unpersuaded as the Standing Order establishing page limits was clear and counsel was "presumed to be familiar with the Court's Order and nevertheless prepared a non-conforming brief." *Id.* at 5 n.4.

Nevertheless, the Court denied the United States' motion to strike the Defendants' motions because doing so would constitute too harsh of a sanction. *Id.* at 5. However, the Court also noted that Defendants' untimely filings "represent[ed] only the latest violation in a long series of violations of the Court's orders" in which Defendants "provide[d] no valid justification

of their dilatory actions." *Id.* "Such behavior," the Court admonished, "is an unacceptable waste of the Court's (and Plaintiff's) time." *Id.* at 5–6. Therefore, the Court ordered Defendants to show cause as to why the Court should not impose sanctions. *Id.*[3]

Moving back to the motion for summary judgment on liability that the United States filed on September 25, 2018, incredibly and notwithstanding the Court's admonishment of Defendants and Defendants' counsel just four days earlier in its order denying the United States' motion to strike, Defendants filed their opposition to the motion one day late. Dkt. Nos. 102, 104. As if that were not enough, Defendants' opposition (including a counter statement of facts and exhibits) was over 9,000 pages long, did not include an appendix, and, by their own admission, included approximately 2,400 duplicate pages that Defendants did not identify. Dkt. No. 109 at ¶ 6, 9.

The United States moved to strike Defendants' untimely opposition, as well as 33 exhibits appended to Defendants' statement of facts as not properly part of the record. Dkt. Nos. 105 and131 (the government later withdrew its request as to one of the exhibits). Regarding the 33 exhibits, the United States asserted that they were not disclosed in discovery, which closed May 25, 2018, nor referenced in Defendants' expert reports. Id. at 3. Defendants in their opposition did not dispute that they had failed to produce the bulk of the challenged material. See generally Dkt. No. 138. Thus, the Court granted the United States' motion as to all 33 exhibits.4 Dkt. No. 142 at 10. In so doing, the Court noted that, discounting duplicates, the

---

[3] Parties have fully responded to the Court's order to show cause, *see* Dkt. Nos. 117, 121, but the Court reserved ruling on the matter until after it has rules on dispositive motions, Dkt. No. 141.

[4] The United States in its current motion to strike, Dkt. No. 154, also seeks to strike the materials represented in Dkt. No. 102-59 ¶¶ 33–35 because, while they were not mentioned in the Courts April 18 Order, "the Court granted the United States' original motion to exclude," which also sought the exclusion of these sections. Dkt. No. 156 at 1 n.1; *see, e.g.*, Dkt. No. 131 at 1 ("The United States also requests that the Court strike paragraphs 23–24, 29–39, and 41 of the Susan Kagel affidavit."). The Court did not address these sections, but paragraphs 33–34 include references to aerial photos not included in Dr. Kagel's expert report. Dkt. No. 131 at 11. As such, these paragraphs should also have been stricken. The Court, however, can find no additionally inappropriate reference in paragraph 35.

exhibits in question totaled 2,101 pages, the "sheer volume" of which "impose[d] substantial prejudice on Plaintiff, negatively effect[d] the efficiency of litigation, and . . . demonstrate[ed] a continued unwillingness to comply with discovery obligations." *Id.* at 8–9.

The Court highlighted one particularly egregious example. In their filings, Defendants *twice* included a 248-page hydraulic engineering report composed by Donna M. Newell and Francisco Aguirre ("the Newell Report"). *See* Dkt Nos. 102-53, 102-60 internal ex. 8 at 233; Dkt. No. 142 at 8. The Newell Report was dated September 17, 2018, four months after discovery closed, and had already explicitly been excluded by the Court. *See* Dkt. No. 70 at 4 (denying Defendants' motion to reopen discovery "in order to secure and have a report prepared by a hydraulic engineer"); Dkt. No. 120 at 3–4 (denying Defendant's motion to consolidate cases because "Defendants in the 90 Action have moved to admit expert testimony [in the form of the Newell Report] that this Court, in the instant case, excluded nearly five months ago"). Not only was the Newell Report twice included, Defendants labeled it "Hydrological and Hydraulic Evaluation . . . *Related to United States v. Brace et al., 17-cv-06 and 1:90-cv-00229*," which the Court characterized as "flagrant disregard" of this Court's prior admonishments that the 1990 Action and the instant action are separate actions. Dkt. No. 142 at 8 (quoting *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997)).

Second, as the challenged opposition brief referenced many of the materials stricken in the first part of its opinion, the Court stated that, "[g]iven the volume of these materials, it is both impractical and unreasonable for the Court to wade through Defendants' current opposition brief, redact those portions (and exhibits) that are improperly included, and then try to decipher Defendants' remaining defenses." Dkt. No. 142 at 10. Thus, this Court struck the oppositions *in totem* and ordered Defendants, in no uncertain terms, to re-brief their opposition "includ[ing]—

and rely[ing] upon—*only* those materials that were produced *during discovery in this action* and that the Court has not otherwise struck." *Id.* at 10 (emphasis in original). Further, the Court admonished Defendants that their refiling "shall **not** include either any new exhibits or any exhibits already stricken." *Id.* at 11. (emphasis in original). Any offending materials, the Court continued, would be "summarily stricken." *Id.*

Defendants refiled their responsive materials on May 10, 2019, Dkt. Nos. 145, 147, and May 13, 2019, Dkt. Nos. 148, 149. The appendix, alone, is spread over two ECF filings, and consists of 32 exhibits totaling over 4,500 pages. Dkt. Nos. 148, 149. That is just the appendix. Defendants' revised responsive detailed statement is 122 pages and in a font with frustratingly inconsistent spacing, while the revised memorandum of law is 48 pages and includes three exhibits of its own totaling 142 pages (just the exhibits). Dkt. Nos. 145 and 147.

The United States moved to strike the sections of Defendants' revised briefing that did not comply with the Court's April 18 Order. Dkt. No. 154. The alleged offending filings include the revised affidavit of Dr. Kagel, Dkt. No. 148-10, a revised affidavit by expert Raymond Kagel ("Mr. Kagel"), Dkt. No. 148-17, the report authored by Dr. Dwayne R. Edwards ("Edwards Report"), Dkt. Nos. 148-15, 149-4, and the entirety of Defendants' revised memorandum of law, Dkt. No. 147. Defendants opposed the motion. Dkt. No. 155.

## II. MOTION TO STRIKE

### A. Legal Standard

Federal Rule of Civil Procedure 16(f) permits a court to impose sanctions, including "striking pleadings in whole or in part" as provided by Rule 37(b), against any party that "fails to obey a scheduling or other pretrial order." FED. R. CIV. P. 16(f)(1)(C) (citing FED. R. CIV. P. 37(b)(2)(A)(iii)). *See, e.g.*, *Ramada Worldwide, Inc. v. VMN Foothills, LLC*, No. 15-4078, 2017 WL 1157864, at *2 (D.N.J. Mar. 28, 2017). Additionally, Rule 37(b), in its own right, permits a

court to strike a pleading as a sanction against any party that "fails to obey an order to provide or permit discovery." FED. R. CIV. P. 37(b)(2)(A)(iii); *see, e.g.*, *Linwood Trading Ltd v. Am. Metal Recycling Servs.*, No. 14-5782, 2017 WL 2825934, at *1 (D.N.J. June 1, 2017), *report and recommendation adopted sub nom. Linwood Trading Ltd. v. Am. Metal Recycling Servs.*, No. 14-5782, 2017 WL 2804948 (D.N.J. June 28, 2017).

## B. Analysis

As this Court made clear in the April 18 Order, Defendants were to file a revised opposition but were "**not** [to] include either any new exhibits or any exhibits already stricken," Dkt. No. 142 at 11 (emphasis in original). Specifically, Defendants were to "include—and rely upon—*only* those materials that were produced *during discovery in this action* and that the Court has not otherwise struck." *Id.* at 10 (emphasis in original). Further, the Court expressly warned Defendants that "inclusion of a new or already-stricken exhibit" would result in the exhibit being "summarily stricken." *Id.* Thus, the Court's April 18 Order was express in its command that Defendants' remove offending material; it was not an invitation for Defendants to expand their pleadings or to reopen discovery.

The United States charges that Defendants violated this Court's order in the following ways. First, the United States asserts that Dr. Kagel's new affidavit, Dkt. No. 148-10, reproduces many of the sections previously stricken by the Court in the April 18 Order, as well as includes new opinions. The United States has been kind enough to provide an exhibit highlighting in yellow sections of Dr. Kagel's report previously stricken as well as in pink new opinions and/or information absent from Defendants' original opposition to the summary judgment motion. Dkt No. 154 at 2–4; Dkt. No. 154-3.

Second, the United States argues that a new affidavit submitted by Raymond Kagel, adds new material not in his original affidavit, which the United States has been kind enough to

highlight in yellow.  Dkt. No. 154-5.

Third, the United States points out that Defendants continue to rely on the Edwards Report, Dkt. Nos. 148-15, 149-4, Dkt. No. 145 at 23; Dkt. No. 148-10 at ¶¶ 30, 32, despite the fact that the Court previously struck it, Dkt. No. 142 at 2 n.2, 5, 9.[5]  Dkt. No. 154 at 5.

Fourth, and finally, the United States argues that the Defendants' revised memorandum of law, Dkt. No. 147, runs afoul of this Court's instructions for two separate reasons.  Dkt. No. 154 at 5.  First, it is 14 pages longer than Defendants' previously filed memorandum of law, Dkt. No. 104, which suggests that new materials have been added in direct defiance of the Court's April 18 Order.  Second, at 48 pages, it is eight pages longer than permitted by the Court's October 17, 2018 Order.  Dkt. No. 99.

Defendants oppose all four of these points.  Dkt. No. 155.  The Court understands Defendants' basic argument to be that several sections of Dr. Kagel's affidavit survive because they have substituted stricken authority with new authority.  *See, e.g.*, Dkt. No. 155 at 4 (as Defendants argue: "[t]he [April 18] Order did <u>not</u>, however, exclude expert testimony contained in the various paragraphs of the [original affidavit], where those paragraphs *relied other than solely* on the stricken exhibits; i.e., they relied also on all or portions of <u>non-stricken</u> exhibits") (emphasis in original); *see also id.* at 5 (revised paragraph 24), 5 (revised paragraph 25), 6 (revised paragraph 30), 6 (revised paragraph 31), 6 (revised paragraph 32), 7 (revised paragraph 37).

Defendants are mistaken.  A simple review of the new Dr. Kagel affidavit against the old

---

[5] The Court struck both the Edwards Report itself, *see* Dkt. No. 142 at 2 n.2 (including the previous locations of the Edwards Report, Dkt. Nos. 102-61, Ex. 12, 102–65, in a list of exhibits being stuck), 5 (striking list of exhibits), and references to Edwards Report, *id.* at 9.

is enough to dispel this assertion. Take for example old paragraph 23[6] and new paragraph 24,[7] which the Court provides in footnotes. It is readily apparent that Defendants have merely removed the reference to the offending exhibit. This does not change the fact that the underlying opinions were not disclosed in Defendants' expert reports, which is why reference to the Newell Report was stricken in the first place. *See* Dkt. No. 70; *see also* Dkt. No. 142 at 8; Dkt. No. 156 at 3–4. For this alone Dr. Kagel's affidavit may be summarily stricken in its entirety per the Court's April 18 Order. But, there is also the matter of the addition of new opinions and facts that the United States highlighted. *See* Dkt. No. 154-3. The Court's April 18 Order was not an invitation to bolster a deficient draft. The Court expressly ordered that the revised materials were not to include new exhibits or previously undisclosed materials. For this too, the Court summarily strikes Dr. Kagel's affidavit in its entirety.

Raymond Kagel's affidavit is even more straightforward. As the United States has highlighted, Dkt. No. 154-5, Mr. Kagel has clearly added significant facts and opinions to his affidavit that were not present in the original. Again, this violates the Court's April 18 Order and the affidavit is summarily struck in its entirety.

Next, as stated above, the Edwards Report and any reference to the Edwards Report were struck by the April 18 Order. Yet, the Edwards Report is back in both form, Dkt. Nos. 148-15, 149-4, and reference, Dkt. No. 145 at 23; Dkt. No. 148-10 at ¶¶ 30, 32. Defendants' only

---

[6] "23. Historical aerial photography reveals that beaver dams and their associated flooding were clearly apparent downstream from the Marsh Site (west of Sharp Road) by at least 2010, especially when compared to earlier periods, such as 1965, when beavers were not nearly so prevalent. LiDAR data collected in 2008 confirm the presence of the beaver dams and their impacts on the surrounding landscape. (Ex. 8 – Newell Hydro Eng. Rpt. 2018, at 14)." Dkt. No. 102-59 at ¶ 23.

[7] "24. Historical aerial photography reveals that beaver dams and their associated flooding were clearly apparent downstream from the Marsh Site (west of Sharp Road) by at least 2010, especially when compared to earlier periods, such as 1965, when beavers were not nearly so prevalent. Aerial photographs from 2008 confirm the apparent presence of beaver dams and their impacts on the surrounding landscape. (Ex. 1 — Kagel Wetland Identification Rpt. (6-1-18), at 9; 34; Appendices A-36, A-38, A-39)." Dkt. No. 148-10 at ¶ 24.

justification for its resurrection is that it was "erroneously stricken." *See, e.g.*, Dkt. No. 155 at 6; *see also id.* at 10–12. The Court declines to reopen settled issues. The Edwards Report, and anything referencing it, are again summarily struck in their entirety.

Turning to Defendants' revised memorandum of law. Dkt. No. 147. It is 48 pages long. The Court's order set the limit for such briefs at 40 pages. Dkt. No. 99. Defendants' response to the United States' current motion to strike does not attempt to justify their blatant disregard for the Court's order. Instead, Defendants seem to flaunt their disregard for court orders by admitting, in a footnote, their brief is overlength but that the United States "has not demonstrated how it has been incurably prejudiced by" an overlength brief. Dkt. No. 155 at 15 n.8. This is not how court orders work. This is only the latest example of Defendants complete disregard of the Court's orders and rules.

Going even further, however, logically it is difficult to see how a brief would grow in length after a party was ordered to remove offending material and not to add new or additional material. The April 18 Order was not an invitation to extend the time Defendants had to respond to the United States' motion for summary judgment by adding new materials, arguments, support, or exhibits. Thus, the fact that Defendants' new opposition has added new material is yet another reason to strike it. It is for this reason that the Court also summarily strikes in its entirety Defendants' revised responsive detailed statement, Dkt. No. 145, as it is now 122 pages; 11 pages longer than its original detailed statement, Dkt. No. 102. The brief is summarily stricken in its entirety.

Thus, the Court GRANTS the United States' motion to strike in its entirety. Dkt. No. 154.

After this culling, none of Defendants' responsive pleadings to the United States' motion

for summary judgment stand.  As such, the motion for summary judgments is both ripe and uncontested.

"Both the Federal Rules of Civil Procedure and a court's inherent authority to control its docket empower a district court to dismiss a case as a sanction for failure to follow procedural rules or court orders."  *Knoll v. City of Allentown*, 707 F.3d 406, 409 (3d Cir. 2013) (citing FED. R. CIV. P. 37(b)(2)(A)(v); FED. R. CIV. P. 41(b); *Link v. Wabash R.R. Co.*, 370 U.S. 626, 629–30 (1962)).  While the Court here is not dismissing Defendants' entire case as a sanction, merely striking its offending pleadings, the Third Circuit has mandated the examination of the *Poulis* factors in cases that are "tantamount to default judgment" because the court's action may "inevitably lead to liability for one party."  *Knoll*, 707 F.3d at 409; *see also Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 177–78 (3d Cir. 1990) (stating that the Third Circuit declines to determine whether consideration of the *Poulis* factors is required "before a court enters a summary judgment on an uncontested Rule 56 motion").  Thus, even though the current action in striking Defendants' pleadings is not tantamount to default judgment because the Court will proceed to examine whether summary judgment is justified on the merits,[8] the Court will examine the *Poulis* factors out of an abundance of caution.

The *Poulis* factors were set forth in the Third Circuit's opinion in *Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863 (3d Cir.1984).  As that Court has stated, "application of *Poulis* . . . comports with [its] underlying concern . . . namely that dismissal as a sanction before adjudication of the merits deprives a party of her day in court."  *Knoll*, 707 F.3d at 409.  The factors include:

---

[8] Third Circuit precedent dictates that a district court may not enter summary judgment where the motion is uncontested without first examining the merits of the case and whether summary judgment is appropriate as a matter of law.  *See infra* at 24–25.

(1) the extent of the *party*'s personal *responsibility*; (2) the *prejudice* to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a *history* of dilatoriness; (4) whether the conduct of the party or the attorney was *willful* or in *bad faith*; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of *alternative* sanctions; and (6) the *meritoriousness* of the claim or defense.

*Poulis*, 747 F.2d at 868 (emphasis in original).

Additionally, "[a]lthough 'not all of the *Poulis* factors need be satisfied in order to dismiss a complaint,' they must all be considered." *Bjorgung v. Whitetail Resort*, 197 F. App'x 124, 126 (3d Cir. 2006) (quoting *Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir.1992)).

*a. Prejudice to the adversary*

Review of the *Poulis* factors here makes abundantly clear the propriety of the Court's actions in this order.[9] Regarding the "the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery," the Court has sought to chronicle and the United States' briefs have attested to their frustrations. *See, e.g.*, Dkt. No. 25 (discussing the United States' difficulty in getting Defendants to agree to an ESI protocol); Dkt. No. 59 (moving the Court to issue a show cause order based on Defendants' late submission, with no explanation, of their expert reports despite the Court's explicit warning that failure to timely provide the reports would result in Defendant being prohibited from using them at trial); Dkt. No. 100 at 6 (in ordering Defendant to show cause as to why the Court should not impose sanctions on defense counsel for filing their *Daubert* motions late, the Court stated that "[s]uch behavior is an

---

[9] The first factor, "the extent of the party's personal responsibility," focuses on the relationship between the named party and their counsel. *See, e.g.*, *Williams v. Schouppe*, No. 18-1319, 2019 WL 3068602, at *2 (W.D. Pa. June 17, 2019) ("[i]n determining personal responsibility for the delay, the Court must distinguish 'between a party's responsibility for delay and counsel's responsibility'" (quoting *Hildebrand*, 923 F.3d at 133)). Defendants here are represented and, while there is ample evidence that many of the delays are the fault of Defendants' counsel, *see e.g.*, Dkt. No. 100 at 2–3 (chronicling counsel's "24 uninterrupted hours" of work in order to submit compliant *Daubert* motions based on "defense counsel's logistical challenges") (internal citations removed), it is unclear to the Court the extent that Defendants' themselves are responsible for delays, although it stretches credulity that Defendants have no idea how counsel is conducting this case. After all, they have been litigating against the government on the Marsh and Murphy Sites for nearly 30 years. As such, the Court will not evaluate this factor further, but finds that the other factors more than amply make up for this ambiguity. *See Mindek*, 964 F.2d at 1373 ("not all of the *Poulis* factors need be satisfied in order to dismiss a complaint").

unacceptable waste of the Court's (and Plaintiff's) time").

It is clear from the record that Defendants' dilatory practices required the United States to spend hours and finite resources deciphering incomprehensible pleadings, scouring through noncompliant briefs, and moving again and again for compliance with this Court's rules, orders, and schedules, all to no avail as more noncompliant briefs and delays were the only results.

The Court finds the one example particularly illustrating. As the Court laid out above, Defendants' original response to the United States' motion for summary judgment consisted of over 9,000 pages and was provided without an appendix. *See supra* at 9–10. Further it contained 2,400 pages of duplicates of which "Defendants do not explain whether this was inadvertent; nor . . . whether they have since alerted Plaintiff as to which pages are duplicates." Dkt. No. 114 at 3. Nor did Defendants explain "how Plaintiff could possibly have known that certain pages were duplicates, at least without expending a considerable amount of time wading through these documents." *Id.* Even when Defendants did provide an appendix, it was "extremely confusing" and "contain[ed] no fewer than 10 columns, none of which describe the exhibit." Dkt. No. 142 at 10 n.4. The United States was forced to "expended numerous hours compiling" a list of exhibits and duplicates before the appendix was produced. Dkt. No. 110 at 2 n.1. The Court characterized this behavior as "impose[ing] substantial prejudice on Plaintiff, negatively effect[ing] the efficiency of litigation, and . . . demonstrat[ing] a continued unwillingness to comply with discovery obligations." Dkt. No. 142 at 8–9.

### b. History of dilatoriness

As for the next factor, "a history of dilatoriness," the Court believes the previously recounted record of the case speaks for itself. *See supra* at 4–11. The Court has even twice labeled Defendants' actions as "dilatory." *See* Dkt. No. 100 at 5 ("[m]oreover, as explained above, Defendants, in their opposition, provide no valid justification of their dilatory actions");

Dkt. No. 114 at 3 ("[f]urther, Defendants' opposition highlights its own dilatory actions").

As detailed above, the Court has warned Defendants on numerous occasions the consequences of submitting late filings without explanation, disobeying court orders, and wasting both the United States' and the Court's time. *See, e.g.*, Dkt. No. 9 at 1 ("[p]leadings which do not comply with these instructions will be summarily denied or stricken"); Dkt. No. 9 at 2 ("[u]ntimely motions or responsive pleadings may be summarily denied, stricken, or ignored"); Dkt. No. 38 at 2 ("Defendants' pattern of failing to respond to discovery requests in a timely manner will not be condoned by the Court"); Dkt. No. 39 ("[a]ny future motions not in compliance with this and other provisions of the Standing Order will be stricken"); Dkt. No. 41 at 2 ("[p]leadings which do not comply with these instructions will be summarily denied or stricken"); Dkt. No. 41 at 2 ("[u]ntimely motions or responsive pleadings may be summarily denied, stricken, or ignored"); Dkt. No. 49 ("[f]ailure to timely provide the Government with this expert report shall result in the Court prohibiting Defendants from using it at trial"); Dkt. No. 62 at 2 ("[t]he Court cautions Defendants that these matters are being tried by two different courts and that Defendants are expected and required to abide by the orders of *this Court* in the matter that is before it") (emphasis in original); Dkt. No. 70 at 7 ("[t]he Court expects that the parties will work cooperatively in order to meet these deadlines"); Dkt. No. 75 at 6 ("[t]he Court, in considering Defendants' amended pleading, will not consider facts asserted for the first time in Defendants' opposition brief"); Dkt. No. 75 at 7 ("[i]t is not the role of the Court to 'put[] together the puzzle of matching' a party's allegations 'with the meat of the attached materials'" (quoting *In re Geiger*, 446 B.R. 670, 679–80 (Bankr. E.D. Pa. 2010))); Dkt. No. 81 ("[t]he Court expects that this will be the last such request from either party"); Dkt. No. 100 at 1 (ordering Defendants to show cause as to why sanctions should not be imposed on defense counsel for

filing untimely *Daubert* motions); Dkt. No. 100 at 6 ("[s]uch behavior is an unacceptable waste of the Court's (and Plaintiff's) time"); Dkt. No. 129 ("'[u]ntimely motions or responsive pleadings may be summarily denied, stricken, or ignored'" (citing Dkt. No. 41 at 2)); Dkt. No. 142 at 5 ("the Court has stressed time and again the separateness of the two actions, which, *inter alia*, involve different time frames, different parties, and different parcels of land"); Dkt. No. 142 at 8 ("[s]pecifically, as indicated above, the Court—in no uncertain terms—denied Defendants' June 2018 motion to reopen their portion of expert discovery 'in order to secure and have a report prepared by a hydraulic engineer'" (quoting Dkt. No. 70 at 4)); Dkt. No. 142 at 10 ("[g]iven the volume of these materials, it is both impractical and unreasonable for the Court to wade through Defendants' current opposition brief, redact those portions (and exhibits) that are improperly included, and then try to decipher Defendants' remaining defenses"); Dkt. No. 142 at 10 ("Defendants are to include—and rely upon—*only* those materials that were produced *during discovery in this action* and that the Court has not otherwise struck") (emphasis in original); Dkt. No. 142 at 11 ("Defendants' new opposition shall **not** include either any new exhibits or any exhibits already stricken") (emphasis in original); Dkt. No. 142 at 11 ("Defendants are hereby warned that any untimely filing—as well as any inclusion of a new or already-stricken exhibit— will be summarily stricken").

Further, the Court's tolerance of Defendants delays has not been without cost in that it has permitted this case to remain unresolved for an unreasonable length of time. *See, e.g.*, Dkt. No. 49 (granting Defendants' motion for extension of time despite being opposed and filed three weeks late); Dkt. No. 62 (excusing Defendants' 10-day late submission of their expert report); Dkt. No. 100 (declining to strike Defendants' untimely *Daubert* motions despite the fact that they were admittedly late, and Defendants could not show good cause as to their delay).

Lastly, Defendants, time and time again, have failed to heed the Court's warnings. *See, e.g.*, Dkt. No. 38 at 2 ("Defendants' pattern of failing to respond to discovery requests in a timely manner will not be condoned by the Court"); Dkt. No. 60 ("[t]he Government has informed the Court that despite the Court's prior warning that 'failure to timely provide the Government with [Defendants'] expert report [would] result in the Court prohibiting Defendants from using it at trial,' [Dkt. No.] 49, Defendants furnished their expert report 10 days late, and without any explanation as to its tardiness"); Dkt. No. 70 at 5 ("[a]s detailed above, Defendants have not been diligent in their efforts to provide an expert report regarding hydraulic engineering"); Dkt. No. 100 at 5 ("[t]he Court agrees with Plaintiff that Defendants' untimely filings represent only the latest violation in a long series of violations of the Court's orders"); Dkt. No. 70 at 5 ("[i]t is astonishing that Defendants waited one month after the Court's deadline to bring the instant motion, which constitutes Defendants *second* untimely request") (emphasis in original); Dkt. No. 100 at 5 ("[m]oreover, as explained above, Defendants, in their opposition, provide no valid justification of their dilatory actions"); Dkt. No. 114 at 3 ("[f]urther, Defendants' opposition highlights its own dilatory actions"); Dkt. No. 114 at 4 ("[d]espite this Order, Defendants, in their instant opposition, wave away Plaintiff's assertion that Defendants have, again, violated the rules by failing to provide an appendix of exhibits"); Dkt. No. 129 (striking two untimely *Daubert* motions filed 56 and 63 days late); Dkt. No. 142 at 8 ("[s]uch behavior constitutes a 'flagrant disregard' of the Court's orders"); Dkt. No. 142 at 8–9 ("[t]he sheer volume of material imposes substantial prejudice on Plaintiff, negatively effects the efficiency of litigation, and—in light of Defendants' (1) having included the Newell Report and (2) well-documented history of violating Court orders—demonstrates a continued unwillingness to comply with discovery obligations").

This recitation constitutes Defendants' transgressions even before the current motion, in which Defendants again directly disobeyed court orders. As such, the Court has no qualms finding Defendants "dilatory."

### c. Bad faith

"In evaluating [the next] factor," that of bad faith, "a court should look for 'the type of willful or contumacious behavior' that can be characterized as 'flagrant bad faith,' such as failing to answer interrogatories for nearly a year and a half, demanding numerous extensions, ignoring admonitions by the court, and making false promises to correct delays." *Hildebrand v. Allegheny Cty.*, 923 F.3d 128, 135 (3d Cir. 2019) (quoting *Scarborough v. Eubanks*, 747 F.2d 871, 875 (3d Cir. 1984)). Thus, the Third Circuit has advised that "[w]illfulness involves intentional or self-serving behavior." *Adams v. Trustees of New Jersey Brewery Employees' Pension Tr. Fund*, 29 F.3d 863, 875 (3d Cir. 1994). Additionally, "repeated and self-serving instances of flouting court authority and professional irresponsibility" demonstrate bad faith. *Id.* at 876 (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639 (1976)).

As indicated in the Court's lengthy list above, the Court finds Defendants have repeatedly flaunted the Court's orders. *See, e.g.*, Dkt. No. 142 at 8 ("[s]uch behavior constitutes a 'flagrant disregard' of the Court's orders"). Defendants have been warned against misconduct, time and time again, only to see the same actions repeated. Therefore, the Court has no doubt the Defendants have conducted this case in bad faith.[10]

---

[10] Also, assuming just for a moment that the United States is correct in its assertions that Defendants have violated the CWA by destroying wetlands on the Marsh Site, all of Defendants obfuscation and delay serves the self-serving purpose of delaying restoration of the wetlands allegedly destroyed. The entire purpose of the CWA, as is often cited, is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); *see, e.g.*, *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 602 (2013); *Olympic Forest Coal. v. Coast Seafoods Co.*, 884 F.3d 901, 905 (9th Cir. 2018). Every delay; every rescheduled deadline; every new motion for sanctions or striking; is another day Defendants get to farm a track of land for their benefit that was supposed to be protected by law.

*d. Alternative sanctions*

The next *Poulis* factor, that of alternative sanctions, also speaks to the propriety of the Court's current action. The Court has threatened the very action it now takes on numerous occasions to no avail. *See, e.g.*, *supra* at 19–21. Additionally, the United States has already moved for attorney fees and expenses, Dkt. No. 53, and the Court has ordered Defendants to show cause why sanctions should not be imposed on defense counsel, Dkt. No. 100, but the Court reserved ruling until it ruled on dispositive motions, Dkt. No. 141. Still the looming threat of sanctions seems not to have reformed Defendants' actions. As such, the Court determines that alternative sanctions are not appropriate here.

*e. Meritoriousness*

Finally, the Court will examine the meritoriousness of granting summary judgment below, *see infra* at 24, but, generally, the meritoriousness factors measures whether a claim or defense would have been successful if allowed to proceed, *see Briscoe v. Klaus*, 538 F.3d 252, 263 (3d Cir. 2008) ("we deem '[a] claim, or defense ... meritorious when the allegations of the pleadings, if established at trial, would support recovery by plaintiff or would constitute a complete defense'" (quoting *Poulis*, 747 F.2d at 869–70)). For example, in *Briscoe*, the Third Circuit held that the district court abused its discretion in dismissing a plaintiff's claims for failure to prosecute where, in part, several of the plaintiff's "claims survived the summary judgment stage of litigation" and therefore "presented genuine issues of material fact, necessitating a trial on the issues" showing that they had merit. *Id.* at 263.

Below, the Court will find that summary judgment is appropriate. *See infra* at 58. This factor, therefore, weighs in favor of the propriety of the Court's sanction, as there are no genuine issues of material fact preventing summary judgment.

Weighing all of the previously mentioned factors, therefore, the Court finds it appropriate

to sanction Defendants by striking all of their responsive briefs to the United States' motion for summary judgment.  *See Poulis*, 747 F.2d 863.

### III.    MOTION FOR SUMMARY JUDGMENT

**A.  Legal Standard**

*1.  Uncontested motions for summary judgment*

While the United States' motion for summary judgment now stands uncontested, the Court may not "grant [it] by default."  Fed. R. Civ. P. 56(e) 2010 cmt.; *accord Anchorage Assocs.*, 922 F.2d at 174–76 (holding that, where local rule allowed district court to treat motion for summary judgment as conceded where no response was filed, more was required to determine whether "judgment for the moving party [was] 'appropriate'" under Rule 56).  Instead, the Third Circuit has determined that, in such circumstances, there must also be "a congruent finding that judgment for the moving party is appropriate as a matter of law."  *Lorenzo v. Griffith*, 12 F.3d 23, 28 (3d Cir. 1993); *see also Stackhouse v. Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir. 1991).

In determining whether granting summary judgment is appropriate under Rule 56, however, the Court may treat the United States' concise statement of material facts, Dkt. No. 84, as admitted.  Fed. R. Civ. P. 56(e) ("[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may: . . . (2) consider the fact undisputed for purposes of the motion"); Fed. R. Civ. P. 56(e) 2010 cmt. ("Subdivision (e)(2) authorizes the court to consider a fact as undisputed for purposes of the motion when response or reply requirements are not satisfied. This approach reflects the 'deemed admitted' provisions in many local rules."); W.D. Pa. LCvR 56(E) ("Alleged material facts set forth in the moving party's Concise Statement of Material Facts . . . which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless

specifically denied or otherwise controverted by a separate concise statement of the opposing party.").  As Defendants have failed to "properly address" the United States' concise statement of facts with a compliant brief, the Court accepts the concise statement as admitted.  *See Lorenzo*, 12 F.3d at 27–28 (when a party fails to properly respond to a motion for summary judgment, the court may adjudicate the merits of the motion "solely on the basis of the evidence [the moving party] presented in its motion").

Thus, the Court must determine whether "the facts set forth in the motion entitle[] [the United States] to judgment as a matter of law." *Anchorage Assocs.*, F.2d 922 F.2d at 176; *see also Reed v. Med. Coll. (Tenet)*, No. 03-4010, 2004 WL 2861874, at *2 (E.D. Pa. Dec. 10, 2004) (proceeding to examine the merits of a claim by plaintiff, under Rule 56, where plaintiff failed to respond to a motion for summary judgment).

2.  *Motion for summary judgment*

Rule 56 provides that a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Constitution Party of Pennsylvania v. Cortes*, 824 F.3d 386, 393 (3d Cir. 2016).  Thus, a court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The initial burden of this showing rests on the moving party, which must point to evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Id.* at 323.  If that party can make such a showing, "'the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial' and do more than 'simply show that

there is some metaphysical doubt as to the material facts.'"[11]  *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

"A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law." *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir.2009) (quoting *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  A factual dispute, in turn, is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At the same time, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.  In making this determination a court must "view the facts in the light most favorable to the non-moving party and [draw] all reasonable inferences in that party's favor." *Tundo v. Cty. of Passaic*, 923 F.3d 283, 287 (3d Cir. 2019) (quoting *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  But, the Court need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions" as they are "insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989).

## B.  Analysis

### 1.  The Clean Water Act

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To achieve that objective, the

---

[11] Defendants have conducted their case in a manner which resulted in their being unable to mount a meaningful opposition to the facts set forth by the United States.

CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless otherwise authorized. 33 U.S.C. § 1311(a). These terms are further defined and elaborated in Section 502 of the CWA, *id.* at § 1362, as well by the regulations of the United States Army Corps of Engineers (the "Corps") and the United States Environmental Protection Agency (the "EPA"), who are tasked with administering the CWA's permitting schemes. *See* 33 U.S.C. § 1344 (the Corps-administered permitting scheme); 33 U.S.C. § 1342 (the EPA-administered permitting scheme).[12] The "discharge of pollutants," is defined as "any addition of any pollutant to navigable waters from any point source," 33 U.S.C. § 1362(12), and "navigable waters" is further defined as "the waters of the United States," *id.* at § 1362(7). At the time of the alleged discharge at issue, "waters of the United States" were defined by the Corps to include a number of interstates waters, such as waters "which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce," their tributaries, and "[w]etlands adjacent to [such] waters." 33 C.F.R. § 328.3(a) (1993).[13]

Section 404 of the CWA authorizes the Secretary of the Army, through the Corps, to issue permits for the "discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a); *see Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 996 (9th Cir. 2013) ("Section 404 of the CWA authorizes the Corps to issue permits for discharge of dredged or fill material into 'navigable waters.'"); *see also Brace*, 41 F.3d at 122. Section 404, however, also provides for a number of exemptions from the Corps' permitting scheme, for example for "normal farming, silviculture, and ranching activities," 33 U.S.C. §

---

[12] The relevant permitting scheme is administered by the Corps. *See generally* Dkt. No. 85 at 9 n.4 (citing to the Corps' regulations). Thus, the Court here refers only to those definitions contained in the Corps' regulations (and in the Act itself), and not those of the EPA.

[13] Both the EPA and the Corps promulgated a new definition of "waters of the United States" in 2015. *See* 80 Fed. Reg. 37,054 (June 29, 2015). The Court, however, utilizes the definition in effect at the times the actions at issue were taken.

1344(f)(1)(A), and for "maint[aining] of drainage ditches," *id.* at § 1344(f)(1)(C). But, even where a Section 404 exemption applies, "the discharge may be 'recaptured' by the permit requirement under Section 404(f)(2)," *Brace*, 41 F.3d at 123, which provides that a discharge which is "incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced," requires a permit, 33 U.S.C. § 1344(f)(2).

Thus, to establish a prima facie case under the CWA, the United States must show that Defendants were "[1] person[s] who [2] discharged a pollutant, [3] from a point source, [4] into navigable waters, [5] without authorization under 33 U.S.C. § 1344." *United States v. Huseby*, 862 F. Supp. 2d 951, 959 (D. Minn. 2012); *see also Brace*, 41 F.3d at 120. If a prima facie case is established, the question becomes whether an exemption applies and, if one does, whether a permit is still required under the recapture provision.

2. *Order granting the United States' motion for partial judgment on the pleadings (Dkt. No. 75)*

Before proceeding to the affirmative case, it is worth briefly recapping what the Court has already decided as to Defendants' defenses to the United States' allegations. On February 9, 2018, Defendants provided their amended answer to the United States' complaint, which included four affirmative defenses. Dkt. No. 44. The United States responded with a motion for partial judgment on the pleadings; the Court granted the motion, Dkt. Nos. 52, 75.

In their amended answer, Defendants advanced four affirmative defenses. First, they claimed "estoppel and/or authorization" based on the allegation that the United States, through an official from the EPA orally "authorized and granted consent" to conduct the alleged actions during a 2012 visit to the Marsh Site. Dkt. No. 44 at ¶¶ 54–65. The Court held this defense

deficient based on a lack of reasonable reliance because "[a] government official's 'oral expression of opinion simply does not rise to the level of an estoppel.'"  Dkt. No. 75 at 14 (quoting *Pediatric Affiliates v. United States*, 230 F. App'x 167, 170–71 (3d Cir. 2007)).  The Court also pointed out that Defendants failed to plead any "affirmative misconduct" on the part of the EPA official or "rare or extreme circumstances" as "required to maintain an estoppel defense against the government."  *Id.* at 14.

Second, Defendants claimed "fraud and/or fraudulent inducement" based on the accusation that the EPA official's same communications represented "fraud" and "misrepresent[ation]."  Dkt. No. 44 at ¶¶ 66–70.  The Court held that Defendants' "brief [and] vague assertions" regarding their fraud defense failed to meet the heightened pleading standard of FED. R. CIV. P. 9(b) and thus granted judgment on the affirmative defense.  Dkt. No. 75 at 16.

Third, Defendants claimed that their actions were exempt from the Section 404's permitting requirement because the land constituted "prior converted cropland" by the USDA under the "Swampbuster" provision of the Food Security Act of 1985 ("FSA").  Dkt. No. 44 at ¶¶ 71–77.  The Court granted judgment on this pleading based on Defendants' failure to show that they met the FSA's requirements.  Dkt. No. 75 at 8–11.

Finally, Defendants claimed that they did not have "fair notice" of the "relevant agency's interpretation of the regulations and statutes," which in turn barred the United States' claims.  Dkt. No. 78–80.  First, the Court rejected, "'as a matter of law' Defendants' argument that they 'should have been directly notified by the EPA of the existence, scope and requirements'" of the CWA.  Dkt. No. 75 at 11 (quoting *Sheyenne Tooling*, 952 F. Supp. at 1418-19.  Quite simply, the Court held that "[i]n a CWA action, 'ignorance of the law is no defense.'"  *Id.* at 12 (quoting *Sheyenne Tooling*, 952 F. Supp. at 1418-19).  Second, the Court expressed that it was even more

"unlikely that Defendants are confused or unaware about the regulations or prohibitions under the Act given that—for almost 30 years—Defendants have been litigating with the EPA over CWA violations on the Marsh Site's neighboring parcel, and already have a consent decree with the Government." *Id.*

Thus, even before Defendants filed their noncompliant response to the United States' motion for summary judgment, the Court has heard, considered, and found against several of Defendants' proffered defenses.

3. *"Persons" that "discharged a pollutant" from "a point source" without a CWA Section 404 permit*

Turning to the affirmative case, four of the five requirements for a prima facie showing of a CWA violation are readily established by the United States' pleadings.

First, Robert Brace, his sons Randall and Ronald Brace, and their companies which make up the Defendants in this matter, are clearly "persons" under the CWA. The CWA defines "person," for the purpose of Section 301(a), as, among others, individuals and corporations. 33 U.S.C. § 1362(5). A person, *i.e.*, individual or corporation, is then liable under the CWA if they "either perform[ed] the work or control[ed] performance of the work." *Sierra Club v. MasTec N. Am.*, No. 03-1697, 2007 WL 4387428, at *3 (D. Or. Dec. 12, 2007); *see also Brace*, 41 F.3d at 122 (stating that the CWA provides for strict liability); *United States v. Pozsgai*, 999 F.2d 719, 725 (3d Cir. 1993) ("[u]npermitted discharge is the archetypal Clean Water Act violation, *and subjects the discharger to strict liability*") (emphasis added).

Here, it is uncontroverted that Robert, Randall, and Ronald themselves conducted the land clearing activities, including clearing, grubbing, ditching, sidecasting, and installing tile drains, for their own benefit and for the benefit of their companies. *See* Dkt. No. 1 at ¶ 38 (complaint stating that "one or more of the Defendants and/or persons acting on their behalf

conducted earthmoving activities"); Dkt. No. 44 at ¶ 38 (amended answer replying "[i]t is admitted only that Defendant did perform some authorized earth moving activities on the Marsh Site"); Dkt. No. 84 at ¶ 41 (stating that in the fall of 2012 "engaged in the following activities in the wetlands at the [Marsh] Site to convert the [Marsh] Site for agricultural use" including clearing, grubbing, ditching, installing tile drain, sidecasting, and mulching (citing depositions by Robert, Ronald, and Randall Brace, Robert Brace Dep., Dkt. No. 84-12, 238:19–240:12, Jan. 9, 2018; Ronald Brace Dep., Dkt. No. 84-29, 85:19–89:21, Jan. 11, 2018; Randall Brace Dep., Dkt. No. 84-31, 102:8–107:21, Jan. 10, 2018 (all testifying to conducting clearing, grubbing, etc. activities))). Thus, the Court finds no genuine dispute of fact as to whether Defendants are "persons" under the CWA.

Second, there is no genuine dispute of fact as to whether Defendants "discharged a pollutant" through their activities. The CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). "Pollutant," in turn, includes "dredged spoil," "biological materials," "rock," "sand," "cellar dirt," and "agricultural waste." *Id.* at § 1362(6).

The Corps' regulations further elaborate these definitions. *See* 33 C.F.R. § 323.2(c) (defining "dredged material"); *id.* at § 323.2(e) (defining "fill material"). But it is unnecessary to go further. It is already uncontroverted that Defendants conducted land clearing activities. The district court in the 90 Action has already determined, and Third Circuit affirmed, that the same land clearing activities constituted a discharge of pollutants in Defendants' earlier action. *See Brace*, 41 F.3d at 122 ("[Mr.] Brace's clearing, churning, mulching, levelling, grading, and landclearing of the formerly wooded and vegetated site was a discharge of a dredged spoil, biological material, rock and/or sand, each of which fits the definition of pollutant"). Therefore,

the Court finds no genuine dispute of fact as to whether Defendants discharged a pollutant under the CWA.

Third, the CWA defines a "point source," as "any discernible, confined and discrete conveyance." 33 U.S.C. § 1362(14). Here, the Defendants have admitted to using mechanized farm equipment, including bull dozers, excavators, and tile machines, to conduct their land clearing activities. *See* Dkt. No. 84 at ¶ 41, 43; *See also, e.g.*, Robert Brace Dep., Dkt. No. 84-12, 239:3–4, Jan. 9, 2018 ("I ran a bulldozer. Randy runs an excavator. Ronnie runs the tile machine."). Courts have determined that mechanized equipment, such as those used by Defendants, constitute point sources. *See, e.g., Pozsgai*, 999 F.2d at 726 n.6 ("[c]ourts have consistently held that dump trucks and bulldozers, such as those used for depositing and spreading fill on the Pozsgais' property, qualify as 'point sources'") (listing cases); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir. 1983) ("we agree with the district court that the bulldozers and backhoes were 'point sources'"); *United States v. Banks*, 873 F. Supp. 650, 657 (S.D. Fla. 1995), *aff'd*, 115 F.3d 916 (11th Cir. 1997) ("[t]he term 'point source' includes bulldozers, dump trucks, and other equipment used to place dredged or fill material in waters of the United States."). Thus, the Court finds that there is no genuine dispute of fact as to the point source element.

 Finally, the alleged discharge must have been conducted without a permit authorized under 33 U.S.C. § 1344. It is uncontested that Defendants did not have a permit. *See* Dkt. No. 84 at ¶ 123; Robert Brace Dep., Dkt. No. 84-12, 253:15–18, Jan. 9, 2018 ("Q Have you ever filled out the Clean Water Act section 404 permit application since 1990? A No. I haven't."); Michael Fodse Decl., Dkt. No. 84-40 at ¶ 16 ("To date, Mr. Brace has not submitted a wetland or stream delineation to the Corps or EPA for approval and has not applied for a CWA Section 404

permit for the work he conducted on the Marsh Site.").  As such, the Court finds no genuine issue of fact as to whether Defendants had a permit to conduct their land clearing activities.

Thus, the United States has established these four elements of a prima facie CWA action and the Court finds that there are no issues of genuine fact as to whether Defendants are persons that discharged a pollutant from a point source without a CWA Section 404 permit.

### 4. *Into the waters of the United States*

As the determination of whether the discharge established above occurred "into the waters of the United States" is a bit more involved, the Court takes this element separately.

### a. *Waters of the United States defined*

As previously mentioned, Section 303(a) of the CWA prohibits the "discharge of any pollutant" unless otherwise authorized. 33 U.S.C. § 1311(a).  "Discharge of pollutants," in turn, is defined as discharging pollutants into "navigable waters," 33 U.S.C. § 1362(12), and "navigable waters" are defined as "the waters of the United States," 33 U.S.C. § 1362(7).

At the time of the alleged discharge, "waters of the United States" were defined in the relevant Corps regulations as:

> (1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
> (5) Tributaries of waters identified in paragraphs (a)(1) through (4) of this section;
> (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1) through (6) of this section.

33 C.F.R. § 328.3(a) (1993).

The instant action involves the claim that Defendants discharged pollutants into the Marsh Site, which the United States claims contains wetlands, Dkt. No. 1 at ¶ 34, and that the Marsh Site wetlands are adjacent to Elk Creek, which is a "perennial tributary that flows approximately 29.2 miles from the Marsh Site to Lake Erie." *Id.* at ¶ 31.  Lake Erie is a

traditionally navigable water meeting the definition of 33 C.F.R. § 328.3(a)(1). *See* Dkt. No. 1 at ¶ 33 (complaint stating "Lake Erie is a traditionally navigable water under 33 C.F.R. § 328.3(a)(1)"); Dkt. No. 44 at ¶ 33 (answer replying "[t]his allegation constitutes a legal conclusion to which no response is required"); *Interlake S. S. Co. v. Nielsen*, 338 F.2d 879, 880 (6th Cir. 1964) ("Lake Erie is, of course, part of the navigable waters of the United States of America"); *United States v. Osborne*, No. 11-2039, 2012 WL 4483880, at *2 (N.D. Ohio Sept. 27, 2012) ([t]he Grand River and Mentor Marsh both flow into Lake Erie and the Grand River, Mentor Marsh and Lake Erie are all "waters of the United States" under 33 C.F.R. § 328.3(a)"). Thus, if the Court finds that the Marsh Site contains, or did contain prior, wetlands, they would be wetlands adjacent to Elk Creek, which is a tributary that flows into the waters of Lake Erie, all of which would then meet the definition of "waters of the United States." 33 C.F.R. § 328.3(a) (1993).

The wetlands inquiry involves two steps. First, alleged wetlands must meet the regulatory definition of wetlands, explained immediately below. Then, they must be sufficiently "adjacent" to waters that themselves constitute waters of the United States in order to satisfy 33 C.F.R. § 328.3(a)(7) (1993). This later inquiry involves the Supreme Court's split decision in *Rapanos*, which will be discussed below. *See infra* at 45–51. The Court will first take these inquiries in turn and first examine whether the Marsh Site contained wetlands pre-disturbance, or possibly still contains wetlands despite the disturbance.

    *b.  Wetlands*

        i.  <u>Definition and delineation</u>

The Corps' regulations define "wetlands" as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in

saturated soil conditions." 33 C.F.R. § 328.3(b) (1993). In order to meet the definition of

"wetland," an area must meet the three criteria set out in the Corps' 1987 Wetlands Delineation

Manual ("1987 Manual"), Dkt. No. 84-23,: "(1) a prevalence of hydrophytic plants,[14] (2)

hydrological conditions suited to such plants,[15] and (3) the presence of hydric soils.[16]" *United

States v. Banks*, 115 F.3d 916, 920 (11th Cir. 1997); *see also United States v. Deaton*, 332 F.3d

698, 712 (4th Cir. 2003) ("[t]o assist in applying [the] regulation, the Corps uses its Wetlands

Delineation Manual, known as the 1987 Manual," which states that "wetlands have 'general

diagnostic environmental characteristics' in the following three categories: vegetation, soil

classification (hydric), and hydrology." (citing 1987 Manual at 13–14)). In addition to the 1987

Manual, the Corps publishes regional supplements to aid in the delineation of wetlands. The

applicable regional supplement for the Marsh Site's region is the Regional Supplement to the

Corps of Engineers Wetland Delineation Manual: Northcentral and Norteast Region (Jan.

2012). Dkt. No. 84-22.

 As described briefly above, under "normal circumstances," all three wetlands factors,

vegetation, soil classification, and hydrology must be present in order for an area to be delineated

as wetlands. The question arises, however, how to delineate alleged wetlands if one or all of the

wetlands indicators have been obliterated by human or natural conduct.

---

[14] "hydrophytic plants," or in laymen's terms "wetland vegetation," are species of plants that have "adapted to growing in conditions where the soil is saturated with water." Dkt. No. 84 at ¶ 22. Such plants can be subdivided into obligate wetland plants, which are "found in wetlands more than 99% of the time," faculative wetland plants, which are "found in wetlands between 67-99% of the time," and faculative plants, which are "found in wetlands between 33-67% of the time." *Thorson*, 2004 WL 737522, at *5. The 1987 Manual provides that the hydrophytic vegetation criterion is met when "more than 50% of the plant species in an area fall into these three categories." *Id.*; *see also* Dkt. No. 102-1 at 16–17 (1987 manual).
[15] "Hydrological conditions" are those conditions that display "wetlands hydrology," *i.e.*, "the soil is saturated 'within a major portion of the root zone (usually within 12 inches of the surface)' for at least 5% of the growing season." *Thorson*, 2004 WL 737522, at *5.
[16] "Hydric soils" are those "formed under conditions of saturation, flooding or ponding for periods long enough to create anaerobic conditions during the growing season." *Thorson*, 2004 WL 737522, at *5.

The 1987 Manual answers this question by describing an alternative special methodology for delineating wetlands where "vegetation, soils, and/or hydrology have been altered by recent human activities or natural events." Dkt. No. 84-23 at 4. These situations are referred to as "atypical situations." *See id.* at 73 (Section F. Atypical Situations); *see also Maple Drive Farms Family Ltd. P'ship v. Vilsack*, 11-692, 2012 WL 6212905, at *9 (W.D. Mich. Dec. 13, 2012), *rev'd on over grounds*, *Maple Drive Farms Ltd. P'ship v. Vilsack*, 781 F.3d 837 (6th Cir. 2015); *New Hope Power Co. v. U.S. Army Corps of Engineers*, 746 F. Supp. 2d 1272, 1275 (S.D. Fla. 2010); *United States v. Thorson*, No. 03-0074, 2004 WL 737522, at *5 (W.D. Wis. Apr. 6, 2004); *Jones v. Rose*, No. 00-1795, 2004 WL 3071688, at *6 (D. Or. Mar. 19, 2004) (all briefly discussing atypical situations).

The 1987 Manual dictates generally the same special methodology for when one of the wetlands indicators is missing. A delineator is instructed to (1) "[d]escribe the type of alteration" that has occurred, (2) "describe the effects" on the missing indicator, (3), "[d]etermine the type of [vegetation/soil/hydrology] that previously occurred," and (4) "[d]etermine whether the [indicator]" was formerly present. Dkt. No. 84-23 at 74–82. In conducting this forensic investigation, delineators are instructed to turn to alternative sources of evidence such as aerial photography, historical records, and reference sites. *See generally id.* Basically, then, the 1987 Manuals' instruction is for a delineator to use alternative evidence not permitted under a "normal circumstances" examination to fill in the blanks of what existed prior to the disturbance.

Atypical methodology is relevant to the present inquiry because, during their assessment of the Marsh Site, officials from the EPA, Corps, the Pennsylvania Fish and Boat Commission ("PAFBC"), and the Pennsylvania Department of Environmental Protection ("PADEP") determined that an atypical situation was present on the Marsh Site given the "disturbed

conditions." Dkt. No. 84 at ¶ 65. Their assessment then utilized the special methodology applicable to an atypical site. *Id.* at ¶¶ 66–69. This methodology was also utilized by the United States' expert, Professor Robert Brooks, Ph.D., in determining whether the Marsh Site contained wetlands. *Id.* at ¶ 73.

The Court must decide whether utilization of this methodology was appropriate, as far as determinations made after the Defendants' land clearing activities. One question, for example, may be whether a delineator may resort to the atypical methodology if only one indicator is missing, or whether he or she must observe that all indicators are missing because of a possible disturbance before turning to the special methodology. The Court decides it was appropriate to invoke the special methodology for the following reasons.

The 1987 Manual provides in its introduction, "[t]he manual also describes (Part IV, Section F) methods for delineating wetlands in which the vegetation, soils, and/or hydrology have been altered by recent human activities or natural events." Dkt. No. 84-23 at 4. As the manual describes, "[t]he definition of wetlands contains the phrase 'under normal circumstances,' which was included because there are instances in which the vegetation in a wetland has been inadvertently or purposely removed or altered as a result of recent natural events or human activities." *Id.* Examples of "human alterations" are described as "draining, ditching, levees, deposition of fill, irrigation, and impoundments." *Id.* As the introduction notes, the determination of whether normal circumstances exist "'involves an evaluation of the extent and relative permanence of the physical alteration of wetlands hydrology and hydrophytic vegetation' and consideration of the 'purpose and cause of the physical alterations to hydrology and vegetation.'" *Id.* (citing RGL 90-7, 26 Sep 90; HQUSACE, 7 Oct 91).

Section F elaborates. As the 1987 Manual further provides, the atypical situations

methodology "should be used only when a determination has already been made in Section D or E that positive indicators of hydrophytic vegetation, hydric soils, and/or wetland hydrology could not be found due to effects of recent human activities or natural events." *Id.* at 73. But, as the text of the 1987 manual makes clear, all three of the wetlands indicators need not be missing or undeterminable before resort to the atypical methods may be had. For example, the 1987 manual characterizes situations in which resort is appropriate, including "[u]nauthorized activities" which may result in "removal or covering of indicators of *one or more* wetland parameters." *Id.* (emphasis added). Further, the 1987 manual provides that when the atypical situations are present, application of the normal circumstance methodology "will lead to the conclusion that the area is not a wetland because positive wetland indicators for *at least one of the three parameters will be absent*." *Id.* at 74 (emphasis added). Thus, utilization of the atypical methodology is appropriate, according to the manual, where "[u]nauthorized activities" have taken place such as "(1) alteration or removal of vegetation; (2) placement of dredged or fill material over hydric soils; and/or (3) construction of levees, drainage systems, or dams that significantly alter the area hydrology." *Id.* at 73–74.

As already established, the Defendants engaged in numerous land clearing activities, which altered vegetation, soil type, and hydrology, including clearing, grubbing, ditching, sidecasting, and installing tile drains. Therefore, the Court finds that use of the atypical situations methodology was appropriate here, given the disturbances the government officials observed even where they could still identify some of the wetlands indicators on the Marsh Site.

This determination also aligns with the deference due by Courts to agencies. As the Supreme Court recently stated, "we presume that Congress intended for courts to defer to agencies when they interpret their own ambiguous rules," under the doctrine commonly referred

to as "*Auer* deference." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) (citing *Auer v. Robbins*, 519 U.S. 452, 462 (1997)). This is especially true in areas requiring scientific expertise as deference is particularly appropriate in "complex and highly technical regulatory program[s]," which "require significant expertise and entail the exercise of judgment grounded in policy concerns," such as the CWA. *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991); *see also Thorson*, 2004 WL 737522, at *9.

For example, in *Deaton*, the Fourth Circuit deferred to the Corps' interpretation of the 1987 Manual regarding whether it utilized the correct method for establishing soil hydrology. 332 F.3d at 713. In essence, the Corps, according to the 1987 Manual's dictates, looks for "saturation within twelve inches of the surface," whereas the defendants argued that the soil must be saturated to the surface. *Id.* at 712–13. The Fourth Circuit deferred to the Corps stating "[h]ere, the Corps simply used the manual's prescribed criterion (the 'within twelve inches' indicator) and methodology (visual observation) in determining that the Deatons' property had the required hydrology for wetlands designation." *Id.* at 713. "If the Deatons want to argue that the 'within twelve inches' criterion is inappropriate," the Court continued, "they must argue that the manual is a flawed interpretation of the regulation defining wetlands." *Id.* Since they did not, the *Deaton* Court concluded that it was "bound to defer to the manual's interpretation of the regulation . . . especially since the interpretation deals in a complex scientific field, wetlands ecology and hydrology." *Id.*

The situation in this case is analogous. First, both the applicable statute and the regulation interpreting them are ambiguous as to what methodology to use when confronted with an area whose vegetation, hydrology, and soil have been clearly altered. *See* 33 U.S.C. 1311(a); *id.* at § 1362(7); 33 C.F.R. § 328.3 (1993); *Kisor*, 139 S. Ct. at 2415 ("a court should not afford

*Auer* deference unless the regulation is genuinely ambiguous").[17]  In fact, they are silent on methodology writ large, leaving the development of the appropriate methodology to use in wetlands delineations to the Corps to determine in their Manual.  Next, the Corps' methods are reasonable, given the difficult task of reassembling the wetlands puzzle after unauthorized changes eliminate some of the telltale indicators.  *Kisor*, 139 S. Ct. at 2415 ("[i]f genuine ambiguity remains . . . the agency's reading must still be 'reasonable'" (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994))).  In these circumstances, it makes sense to engage in a forensic analysis considering how the disturbances may have affected the presence of each of the three wetland parameters by utilizing alternative sources of information such as aerial photography, historical records, and reference sites.  *See generally* Dkt. No. 84-23 at 74–82.

Additionally, there is sufficient reason to defer to the Corps as the determination of whether wetlands exist on a given site is a highly technical matter of science for which the Corps has laid out parameters according to the 1987 Manual.  *See Kisor*, 139 S. Ct. at 2414 ("when the reasons for that presumption do not apply, or countervailing reasons outweigh them, courts should not give deference to an agency's reading").  Here the "character and context of the agency interpretation," *Id.* at 2416, is appropriate for deference as the question involves a "complex scientific field, wetlands ecology and hydrology" for which the Corps, not the Court, is expert, *Deaton*, 332 F.3d at 713; *see also Kisor,* 139 S. Ct. at 2417 ("the agency's interpretation must in some way implicate its substantive expertise").[18]

_____

[17] The Court does not provide a lengthy elaboration on "traditional tools of construction" because it determines that the "legal toolkit is empty" based on the fact that none of the cited laws or regulations discusses how to delineate wetlands.  *Kisor*, 2415 S. Ct. at 2415.  In fact, this is the whole purpose of the 1987 Manual and Regional Supplement; to help delineate wetlands according to specific science-based criteria considering the uniqueness of each region of the country.

[18] Additionally, the 1987 Manual certainly reflects the "fair and considered judgment" of the Corps, as opposed to "a 'convenient litigating position' or 'post hoc rationalizatio[n] advanced' to 'defend past agency action against attack'" as it well established and significantly predates the initiation of this action.  *Kisor*, 139 S. Ct. at 2417.

Thus, the Court defers to the Corps' construction of the applicability of the atypical situations methodology in situations like this where one or more, but not all, of the wetlands indicators are missing because of disturbance. The Court also finds it appropriate that the delineators in this case invoked the atypical situations methodology when confronted with the disturbed Marsh Site

### ii. Wetlands existed, and continue to exist, on the Marsh Site

Using such methodology, the United States has provided sufficient evidence to determine that there is no genuine issue of fact as to whether the Marsh Site contains wetlands, both pre- and post-disturbance by Defendants.

In 1990, the EPA inspected the Marsh Site as a reference site to "determine a baseline for pre-disturbance conditions on the Murphy site" in relation to the 90 Action. Dkt. No. 84 at ¶ 29. This examination occurred prior to the Defendants disturbing the Marsh Site and thus a "normal circumstances" evaluation was appropriate. During the inspection, inspectors identified all three wetlands criteria at the place they inspected and therefore determined that wetlands were present on the Marsh Site. *Id.* at 30; *see also* Charles Rhodes, Jr. Decl., Dkt. No. 84-25 at ¶ 9 ("[a]s a result of the 1990 inspection, and in accordance with accepted wetland delineation field protocols, we determined that . . . the reference area studied within the Marsh Site . . . was a wetland because it exhibited all three wetland parameters").[19] Thus, there is uncontroverted evidence that wetlands existed on the Marsh Site prior to Defendants' land clearing actions.

---

[19] The EPA inspector utilized the 1989 version of the Federal Manual for Identifying and Delineating Jurisdictional Wetlands ("1989 Manual"). *See* Dkt. No. 132 at 21. The EPA, however, withdrew the 1989 Manual in 1993 and reverted to the 1987 Manual, as in use today. *See* Environmental Protection Agency, Memorandum of Agreement Concerning the Determination of the Geographic Jurisdiction of the Section 404 Program, 58 Fed. Reg. 4,995. Still, the 1989 Manual was in effect at the time the site visit was conduct and thus was the authoritative guidance for use by the inspectors. Additionally, the 1989 Manual and the 1987 Manual do not differ in their requirement that all three wetlands indicators must be present under normal circumstances for an area to be identified as a wetlands. *Compare* Dkt. No. 102-1 at 9–10 (1987 Manual) *with* Dkt. No. 132-2 at 5 (1989 Manual). Thus, the Court sees no issue with its use during the 1990 inspection.

In July 2012, an EPA official, along with an official from the Corps, visited the Defendant's property "at Mr. Brace's request to discuss whether Mr. Brace could perform ditch maintenance activities on the Murphy site." Dkt. No. 84 at ¶ 35. This visit occurred approximately a month after Mr. Brace purchased the Marsh Site in May of 2012. While they did not conduct an official examination or delineation, the officials observed the Marsh Site from the road that divides it from the Murphy Site. The EPA official noted several wetlands indicators, which led him to conclude that wetlands were still present on the Marsh Site. *Id.* at ¶ 35; Todd Lutte Decl., Dkt. No. 84-11 at ¶ 10 ("I advised [Mr. Brace] that he should first get a delineation to determine the extent of wetlands on the Marsh Site. I was confident of the presence of wetlands on the Marsh Site because I observed wetland indicators such as the overwhelming dominance of hydrophytes (including silky dogwood and arrow arum), as well as standing ponded water throughout the Site"). Thus, there is uncontroverted evidence that the wetlands present on the Marsh Site, as determined in 1990, persisted through 2012, as long as a month after Mr. Brace purchased the land but prior to Defendants' disturbance of the land.

The United States offers further evidence to support this conclusion in the form of aerial photographs analyzed by its expert Dr. Peter Stokely.[20] Dkt. No. 84 at ¶ 36–37. Dr. Stokely analyzed both historical and contemporary aerial photographs for a "wetlands signature," or, in

---

[20] Defendants have moved to strike this expert report. Dkt. No. 86. Additionally, Defendants' expert, Dr. Kagel, disputes Dr. Stokely's conclusions as "overreaching, flawed, scientifically unsupportable, and unreliable." Dkt. No. 82-2 at IV. The United States, however, has moved to strike this portion of Dr. Kagel's report. Dkt. No. 82. The Court finds it unnecessary to fully resolve these motions. Dr. Stokely is unquestionably qualified to provide the expert aerial interpretation provided; he was even admitted for this same expert advice in the 90 Action. *See* Dkt. No. 84-32 at ¶ 11. The crux of Dr. Kagel's objection appears to be her contention that "wetlands can[not] be accurately identified via aerial photography" because such wetlands "can only be legally and positivity identified using the 3-Parameter approach, promulgated in the 1987 [Manual]." Dkt. No. 82-2 at ¶ 23. But, here, the United States is not introducing Dr. Stokely's evidence to legally delineate the Marsh Site. Instead, it is used to support the previous conclusion, determined by the 1990 inspection. *See* Dkt. No. 85 at 18–19 ("[t]he existence of wetlands on the Marsh Site prior to Defendants' disturbances is *further supported* by aerial photographs") (emphasis added). Thus, the Court considers it as collateral evidence indicating that wetlands indicators were present prior to Defendants' disturbance on the site, which supports the positive identification which occurred in 1990.

other words, he reviewed notable indicators identifiable from the air, including "landscape position (e.g. depressions, low gradient drainage areas, flood plains, adjacency to lakes, estuaries or other water features), characteristic vegetation cover (emergent, shrub or forested vegetation) and indications of water (standing water, wetland drainage patterns,  persistent ground moisture conditions and dark photographic tones)," that tend to indicate the presence of wetlands.  Dkt. No. 84-32 at ¶ 13.  Based on this analysis, Dr. Stokely concluded that "dat[ing] from 1939 through 2011" aerial photographs show "consistent wetland signature on the [Marsh] Site."  *Id.* at 21.

This view is confirmed by the Braces' own admissions.  *See* Dkt. No. 84 at ¶ 31.  Randall Brace, for example, stated that at the time of purchase the Marsh Site was "wet" and "growed up."  Randall Brace Dep., Dkt. No. 84-31, 97:21–23, Jan. 10, 2018.  Robert Brace similarly answered "yes" when asked whether there was standing water, ponding, and trees and shrubs on the Marsh Site.  Robert Brace Dep., Dkt. No. 84-12, 237:14–20, Jan. 9, 2018.

Based on the foregoing, the Court concludes that the United States has presented sufficient evidence to show that there is no genuine fact as to whether wetlands existed on the Marsh Site prior to the Defendant's land clearing actions.

In June 2013, investigators from the EPA, Corps, PADEP, and PADEP visited the Marsh Site.  Based on the evident disturbances, including clearing, grubbing, and installation of tile drains, the investigators concluded that an "atypical situation" existed at the site and thus utilized the atypical methodology prescribed by the 1987 Manual.  Dkt. No. 84 at ¶ 65.  They took samples from three points on the Marsh Site and observed wetlands indicators at each point, although no one point contained all three indicators at once.  *See id.* at ¶ 66–67.  They, instead, turned to collateral evidence, as prescribed by the 1987 Manual, to attempt to forensically

reassemble the site after it had been disturbed. After reviewing National Wetlands' Inventory ("NWI") mapping, soil surveying, and historical aerial photographs, the EPA investigator concluded "Defendants' clearing, grubbing, side-casting and installing of drain tile had impacted approximately 14 acres of wetlands on the Marsh Site adjacent to Elk Creek." Dkt. No. 84 at ¶ 69; *see also* Todd Lutte Decl., Dkt. No. 84-11 at ¶ 22. Investigators from the PADEP came to the same conclusion. Dkt. No. 84 at ¶ 70. Thus, despite the disturbances, government officials utilizing the appropriate methodology determined that wetlands persisted on the Marsh Site despite Defendants' actions.

Finally, the United States presents the expert determination of Dr. Robert Brooks, who concluded that "wetlands were present on the Marsh Site before being altered by Mr. Brace," and that the "structure and function of wetlands on the Marsh Site and reach of Elk Creek adjacent to the Marsh Site have been severely altered post-disturbance causing negative impacts to the delivery of functions and ecosystem services to the immediate area, and to downstream waters." Robert Brooks Decl., Dkt. No. 84-19 at ¶ 6.[21] Dr. Brooks utilized the atypical situation methodology when making his determination. Dkt. No. 84 at ¶ 73. He conducted a site visit in October 2017 and tested six sample sites. *Id.* at ¶ 75. He also reviewed aerial photographs, the EPA's inspection reports from 1990, NWI mapping, and inspected five undisturbed reference sites. *Id.* at ¶¶ 74, 86–87. This testing led him to conclude that "[d]espite fairly extensive human

---

[21] Defendants have moved to exclude Dr. Brooks' expert testimony on similar grounds to Dr. Stokely. Dkt. No. 87. They attack both his qualifications as an expert and his conclusions as unreliable. First, as to Dr. Brooks, qualifications, he is exceedingly qualified as an expert on wetlands. *See* Dkt. No. 84-19, Attach. B (*Curriculum Vitae* of Robert Brooks, Ph.D., Professor of Geology and Ecology at the Pennsylvania State University). Next, to the extent that Defendants' claim that Dr. Brooks' mythology and testing was incorrect based on the invocation of an atypical situation, Dkt. No. 87 at 6–12, the Court has already ruled on this issue. *See supra* at 41. Additionally, Defendants' arguments as to Dr. Brooks' qualifications is similarly incorrect. They assert that Dr. Brooks is not qualified in jurisdictional determinations. *Id.* 87 at 3–4. Here, however, his testimony is being presented to determine if wetlands exist or existed on the Marsh Site, not their extent nor the regulatory consequences of that determination. Further, Defendants attack Dr. Brooks' qualifications as an expert in aerial photograph interpretation. *Id.* at 2–3. The United States, however, has not designated him as such. *See* Dkt. No. 115 at 4.

disturbances to the terrain and waters of the Marsh Site all six sample points still had characteristics common to wetlands." Robert Brooks Decl., Dkt. No. 84-19 at ¶ 26. At all six points the soil "showed characteristics of hydric soils," and "hydrophytic vegetation dominated." *Id.* at ¶¶ 27, 28. Based on these observations, and his overall investigations, Dr. Brooks concluded that "wetlands are present currently at all six sample points of the Marsh Site, despite efforts to alter the hydrology and vegetation in 2012." *Id.* at ¶ 37. Based on the overall evidence presented, the Court concludes that there is no genuine dispute of fact that the Marsh Site contained wetlands prior to the Defendants actions and that wetlands persist despite those actions.

### c. The Marsh Site's wetlands are waters of the United States

Having determined that wetlands existed, and continue to exist to some extent on the Marsh Site, the Court next examines whether they constitute "waters of the United States." As stated previously, Corps regulation defines "waters of the United States" to include "[w]etlands adjacent to" previously enumerated waters of the United States. 33 C.F.R. § 328.3(a) (1993). The regulation further defines "adjacent" to mean "bordering, contiguous, or neighboring." *Id.* at § 328.3(c). In *Rapanos v. United States*, 547 U.S. 715, the Supreme Court sought to establish a test to conclude when wetlands are sufficiently "adjacent" to a water of the United States to themselves constitute waters of the United States, *see id.* at 724–29 (tracing the history of Supreme Court interpretation to that date). The Court fractured, with Justice Scalia writing for a four-justice plurality, Justice Kennedy writing a concurrence, and Justice Stevens writing a dissenting opinion on behalf of four justices.

Justice Scalia's plurality opinion concluded that wetlands only fall within the scope of the CWA if they have "a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and 'wetlands.'"

*Id.* at 742; *see also Donovan*, 661 F.3d at 179.  Justice Kennedy, on the other hand, determined that wetlands were subject to CWA jurisdiction if they possessed a "significant nexus" with "waters of the United States," or, in other words, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"  *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring); *see also Donovan*, 661 F.3d at 180.  Based on this fractured opinion, the Third Circuit determined that "jurisdiction to regulate wetlands under the CWA exists if the wetlands meet either the plurality's test or Justice Kennedy's test from *Rapanos*."  *Donovan*, 661 F.3d at 184; *see also Tri-Realty Co. v. Ursinus Coll.*, No. 11-5885, 2013 WL 6164092, at *9 n.8 (E.D. Pa. Nov. 21, 2013) ("[i]n *Donovan*, the Court of Appeals for the Third Circuit examined the holdings in *Rapanos* and held that wetlands meeting either the plurality test or Justice Kennedy's test fall within the jurisdiction of the Corps under the CWA").

First, there can be no genuine dispute of material facts that Elk Creek constitutes waters of the United States, as the record shows that it is a "perennial tributary that flows approximately 29.2 miles from the Marsh Site to Lake Erie," itself a water of the United States.  Dkt. No. 1 at ¶ 31; *supra* at 33–34 (establishing Lake Erie as waters of the United States); 33 C.F.R. § 328.3(a)(5) (1993) ("waters of the United States" include "[t]ributaries of waters identified in paragraphs (a)(1) through (4) of this section"); see also *Brace v. United States*, 72 Fed. Cl. 337, 341 (2006), *aff'd*, 250 F. App'x 359 (Fed. Cir. 2007) (establishing that Elk Creek is a relatively permanent perennial tributary which "Elk Creek [] flows in a northwesterly direction . . . before proceeding on to Lake Erie"); *United States v. Brace*, No. 90-229 (W.D. Pa. Dec. 16, 1993), slip. Op. ¶¶ 7–8, *available in relevant part* at Dkt. No. 84-8 (finding in fact, after stipulation, that Elk Creek "is an interstate waterway" and that Lake Erie "is also an interstate waterway").  Thus, the

question is whether the wetlands on the Marsh Site satisfy either the plurality's test in *Rapanos* or Justice Kennedy's concurrence. *See Donovan*, 661 F.3d at 184.

The United States has presented sufficient evidence to satisfy its "burden on summary judgment of showing that [Defendants'] land was subject to the Corps' jurisdiction." *Donovan*, 661 F.3d at 185. First, it has provided evidence and expert reports that the wetlands on the Marsh Site maintain a "continuous surface connection" to Elk Creek.

In order to satisfy that standard, wetlands must connect sufficiently to "mak[e] it difficult to determine where the 'water' ends and the 'wetland' begins." *Rapanos*, 547 U.S. at 742. In other words, "they only fall within the scope of the CWA if they have 'a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands.'" *Donovan*, 661 F.3d at 179 (quoting *Rapanos*, 547 U.S. at 742). This may occur for example, "the River overflows the levee and the two bodies of water commingle." *N. California River Watch v. City of Healdsburg*, 496 F.3d 993, 1000 (9th Cir. 2007). It may also occur "when a wetland physically abuts another regulated body of water." *United States v. Donovan*, No. 96-484, 2010 WL 3000058, at *4 (D. Del. July 23, 2010), *report and recommendation adopted*, No. 96-484, 2010 WL 3614647 (D. Del. Sept. 10, 2010), *aff'd*, 661 F.3d 174 (3d Cir. 2011).

Here, the wetlands on the Marsh Site physically abut Elk Creek. *See* Dkt. No. 84 at ¶ 116; Todd Lutte Decl., Dkt. No. 84-11 at ¶ 20 (During June 2013, Todd Lutte, the EPA official working this case, stated "[w]hile on the Site, I observed that the disturbed wetlands directly abutted and had a continuous surface connection to Elk Creek for the length of the Site"); Peter Stokely Decl., Dkt. No. 84-32 at ¶¶ 4 ("I conclude that prior to the disturbances . . . approximately 18.5 acres of wetlands were present on the Marsh Site . . . [which] . . . are

adjacent to, and directly abut, Elk Creek, a direct tributary to Lake Erie and are part of system of wetlands in the Elk Creek valley"), 27 ("[t]he Marsh Site wetlands are adjacent to, and directly abut, Elk Creek" and "cover[] much of the Marsh Site and extend[] to the bank of Elk Creek"). Additionally, Dr. Brooks concluded that "[b]ecause of the flat terrain throughout the region of the Marsh Site," Dkt. No. 84 at ¶ 100, "Elk Creek would have flooded into its floodplain and adjacent wetlands on the Site, as is visible in historical aerial photographs," *id.* at 101; *see also* Robert Brooks Decl., Dkt. No. 84-19 at ¶ 48–49. The Court finds the surface connectivity test satisfied.

The Court also finds Justice Kennedy's "significant nexus" standard satisfied. Under that standard, wetlands fall under CWA jurisdiction where they "alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 780; *see also Donovan*, 661 F.3d at 186 (finding the expert report satisfied Rule 56 burden by showing that wetlands "contributed [to] flow," "help[ed] to remove nitrogen and protect . . . from excessive nutrient loading," "help[ed] sequester pollutants . . . from downstream waters," "provid[ed] habitats and nutrients for fish species," "suppl[ed] energy and nutrients to aquatic life in downstream navigable waters," "retain[ed] water," "reduc[ed] sediment loads and pollutants from storm water," and "maintain[ed] stream flow and preserv[ed] fish and wildlife habitats").

The Marsh Site satisfies the "significant nexus" standard. The United States' expert, Dr. Brooks, conducted a study of the Marsh Site wetlands and their connectivity, along with other waters in the vicinity, to Elk Creek and Lake Erie. Robert Brooks Decl., Dkt. No. 84-19 at ¶ 3. He provided a report detailing his conclusions along with his methodology, finding, and opinions. *See id.* at Att. A. Based on his studies, Dr. Brooks concluded that the "headwater

wetlands of the Marsh Site and similarly situated wetlands within the watershed make important contributions to the ecological health, condition, and integrity of Elk Creek and Lake Erie." *Id.* at ¶ 7.

In order to reach this conclusion, Dr. Brooks started by examining a series of aerial photographs taken between 1939 and 2016, reviewing the relevant NWI wetlands mapping, considering ground level photographs, videos, site inspection reports, and inspection data sheets from the site inspections in 1990, 2012, and 2013, and visiting the Marsh Site, and the vicinity, on October 16–17, 2017. *See id.* at ¶¶ 12, 13, 14, 15. While onsite, Dr. Brooks utilized the 1987 manual and other regulatory guidance to identify the presence of wetlands. *Id.* at ¶ 17. He chose and sampled the ecological characteristics of six points on the Marsh Site itself. *Id.* at ¶ 19. He also examined five similar wetlands on public lands or accessible private lands around the Marsh Site as reference points. *Id.* at ¶¶ 38–39. While onsite, Dr. Brooks also followed the path of Elk Creek all the way from the Marsh Site to its confluence with Lake Erie at Erie Bluff's State Park. *Id.* at ¶ 42. Based on all of these examinations and studies, Dr. Brooks concluded that the "Marsh Site wetlands consist of a variety of types that, when in healthy condition, provide numerous functions or ecosystem services, including floodwater storage, water quality treatment, and habitat complexity." *Id.* at ¶ 46.

For example, Dr. Brooks concluded that "[p]rior to Defendants' activities on the Marsh Site, Elk Creek would have flooded frequently into its floodplain and adjacent wetlands on the Site," without which, "flows rates increase and scouring occurs, increasing the amount of sediment, among other things, rushing downstream." *Id.* at ¶¶ 48, 49. Based on these increased flow rates "flooding in downstream towns becomes worse with a subsequent increase in potential harm to local residents, local infrastructure, and to the aquatic habitats of Elk Creek and Lake

Erie." *Id.* at ¶ 48. Dr. Brooks also concluded that "pre-disturbance dense trees and shrubs" that once covered the Marsh Site "provided high stem density" which also slowed flow rates downstream. *Id.* at ¶ 49.

Dr. Brooks also noted that the wetlands on the Marsh Site also served an important role in storing excess water, both in terms of "amount stored and the timing of storage." *Id.* at ¶ 51. "As a result," he concludes "flood peaks are higher downstream, and floods are comprised of faster moving water" which result in damage to both infrastructure and degradation of aquatic habitats. *Id.* The wetlands on the Marsh Site serve an especially important role here, as Dr. Brooks explains, because the "the cluster of NWI-mapped wetlands on the Marsh Site and immediately adjacent is the largest wetland cluster along the entire length of Elk Creek." *Id.* at ¶ 53.

Continuing, Dr. Brooks also concluded that wetlands on the Marsh Site also serve important chemical functions for Elk Creek and Lake Erie, including nutrient cycling and pollutant and sediment trapping and filtration. For example, wetlands such as those on the Marsh Site "remov[e] [] excess nitrogen from the ecosystem either as released gas into the atmosphere, or in the formation of biomass held in roots, stems, and trunks." *Id.* at ¶ 54. They also received excess runoff from adjacent roads and parcels, trapping them and "chemically transform[ing]" pollutants "before flowing into Elk Creek and ultimately Lake Erie." *Id.* at ¶ 55. This trapping of pollutants and excess nitrogen "improves water quality for the receiving downstream waters, including Elk Creek and Lake Erie." *Id.* at ¶ 55. For example, as Dr. Brooks explained, "[r]ecent severe algal blooms occurring in Lake Erie are, in part, caused by excess nutrients flowing into the lake from tributaries within the drainage basin, such as Elk Creek, so wetlands throughout the Elk Creek watershed, but especially the Marsh Site cluster of

wetlands, being the largest in area." *Id.*

The wetlands also serve important biological functions, including supporting life in Elk Creek and Lake Erie by providing "coarse and fine particular matter that is consumed as food [by] aquatic life," which, Dr. Brooks concluded "was in evidence in Elk Creek." *Id.* at ¶ 58. As he described, the "Elk Creek reach adjacent to the Marsh Site was assessed by PADEP for the 2016 Triennial Integrated Water Quality Monitoring and Assessment Report," which "sampled for aquatic macroinvertebrates and water chemistry throughout the watershed." *Id. at ¶ 59.* The result was that the report concluded that "Elk Creek has sufficient water chemistry and habitat to support a healthy community of aquatic macroinvertebrates" partly because "wetlands throughout the watershed assist in reducing inputs of sediments, nutrients, and other pollutants." *Id.* As Dr. Brooks concluded, "[t]he loss of shrub and tree cover along and near Elk Creek translates to a loss of habitats for a variety of aquatic and terrestrial species." *Id.* at ¶ 60.

Based on this testimony, and the accompanying report, the Court concludes that the United States has presented sufficient evidence to satisfy its burden under Justice Kennedy's "significant nexus" test. *See Donovan*, 661 F.3d at 186. "However," as dictated by *Donovan*, the "analysis does not end here." *Id.* "Having determined that the Government met its initial burden under Rule 56, [the Court] must next analyze whether [Defendants] came forward with specific facts showing that there is a genuine issue for trial." *Id.* (citing *Matsushita*, 475 U.S. at 586–87). Of course, here Defendants have failed to provide a proper response to the United States' motion for summary judgment. They were given two opportunities, *see* Dkt. Nos. 104, 147, but both were struck for failure to follow the Court's explicit rules and orders, *see* Dkt. No. 142; *supra* at 15. Thus, the Court finds that there is no dispute of genuine fact as to whether the wetlands on the Marsh Site constitute waters of the United States, either pre- or post-disturbance.

*5. No exemptions apply*

Based on the foregoing, Defendants were persons who discharged a pollutant from a point source into navigable waters without authorization under 33 U.S.C. § 1344 in violation of Section 303(a) of the CWA. *See Huseby*, 862 F. Supp. 2d at 959; *see also Brace*, 41 F.3d at 120. Thus, they are liable unless an exemption applies.

Of course, Defendants have failed to identify an applicable exemption because they have failed to properly respond to the United States' motion for summary judgement. Additionally, the Court already struck a claimed "exemption" defense for "prior converted cropland" as part of Defendants' amended answer. *See* Dkt No. 75. But, for a sense of completeness, the Court will examine two potentially relevant exemptions, those of "normal farming" 33 U.S.C. § 1344(f)(1)(A), and for "maint[aining] of drainage ditches," *id.* at § 1344(f)(1)(C).

Section 404 of the CWA establishes a three-step process for determining whether a permit is required. First, it provides that the Corps may issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* at § 1344(a). Thus, where the requirements of Section 301(a) are met, a discharger must obtain a permit. Second, Section 404(f)(1), provides six exemptions from the permitting requirement. *See id.* at § 1344(f). For example,

> [u]nder Section 404(f)(1), a permit is not required for: (1) the discharge of dredged or fill material "from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices," 33 U.S.C. § 1344(f)(1)(A), and (2) the discharge of dredged or fill material "for the purpose of ... the maintenance of drainage ditches," 33 U.S.C. § 1344(f)(1)(C).

> *Brace*, 41 F.3d at 123.

> Both of these exemptions will be explored further below.

> Third, "[e]ven where Section 404(f)(1) exempts a discharge from the permit requirement,

the discharge may be 'recaptured' by the permit requirement under Section 404(f)(2)." *Brace*, 41 F.3d at 123. Thus, if an alleged discharge fits one of the permitting exemptions, a permit may still be required if it meets the requirements of Section 404(f)(2). Section 404(f)(2), in turn, provides that:

> Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

33 U.S.C. § 1344(f)(2).

In other words, the listed exemptions of Section 404(f)(1) are unavailable where the otherwise exempt discharges are made, for example, for the purpose of converting wetlands.

Thus, in order to qualify for an exemption, the Defendants' activities must fall into one of Section 404(f)'s elaborated exemptions and avoid recapture by Section 404(f)(2). *See Brace*, 41 F.3d at 123–24; *see also Huseby*, 862 F. Supp. 2d at 962. Defendants maintain the burden of "demonstrating that proposed activities both satisfy the requirements of Section 404(f)(1) and avoid the recapture provision of Section 404(f)(2)." *Brace*, 41 F.3d at 124 (citing *United States v. Akers*, 785 F.2d 814, 819 (9th Cir.), *cert. denied*, 479 U.S. 828 (1986)).

Fortunately, the Third Circuit has largely answered these questions already as they pertain to the Defendants.

### a. Normal farming, silviculture, and ranching activities

The first potentially relevant exemption is for "normal farming." There is evidence, for example, that some farming activities were conducted on the Marsh Site, although the extent and duration of those activities are debated. *See, e.g.*, Dkt. No. 7 at ¶ 58 ("[t]he United States' claims are barred, in whole or in part, based on [Defendants'] consistent use of the property at issue for agricultural purposes"); Dkt. No. 84 at ¶ 33 ("[b]oth of Mr. Brace's adult sons, Randall and

Ronald, testified that the Marsh Site had not been farmed in decades before Mr. Brace purchased the property"); Peter Stokely Decl., Dkt. No. 84-32 at ¶¶ 5, 23–24 (determining from aerial photographs that "portions of the Marsh Site . . . may have been cultivated prior to the 1970's" but that "from the 1970's, it appears that cultivation in those areas had ceased by 1977" and had "reverted to the 18.5 acres of wetland extent I identified prior to disturbances that are the subject of this litigation"); Robert Brace Dep., Dkt. No. 84-12 at 234:8–12, Jan. 9, 2018 ("Q What were the conditions of the Marsh site when you purchased it? Physically, what did it look like? A The aerial photography will show you what it is. Like I'm saying, it was farmed.").

Section 404(f) provides that

the discharge of dredged or fill material . . . from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices . . . is not prohibited by or otherwise subject to regulation under this section or section 1311(a).

33 U.S.C. § 1344(f)(1)(A).

The Corps has further promulgated that "[t]o fall under this exemption," a Defendant's activities "must [(1)] be part of an established (i.e., on-going) farming, silviculture, or ranching operation" and (2) "be in accordance with definitions in § 323.4(a)(1)(iii)." *Id.* at 323.4(a)(1)(ii). Section 323.4(a)(1)(ii) also provides that "[a]ctivities which bring an area into farming . . . are not part of an established operation" and that "[a]n operation ceases to be established when the area on which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operations." *Id.*; s*ee Brace*, 41 F.3d at 123.

As it pertains to the requirement to satisfy the definitions in Section 323.4(a)(1)(iii), that subsection elaborates on crucial terms such as "plowing," which, according to the regulation,

does not include "the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dry land" and that the "means to fill in wetland areas is not plowing." 33 C.F.R. § 323.4(a)(1)(iii)(D). Further, the definition of "minor drainage" does not include "drainage associated with the immediate or gradual conversion of a wetland to a non-wetland." *Id.* at § 323.4(a)(1)(iii)(C)(2); *see also Brace*, 41 F.3d at 123.

In interpreting these terms, and evaluating the applicability of the normal farming exemption to Defendants' activities on the Murphy Site, the Third Circuit explicitly held that "an exemption is available only to activities that are part of an 'established farming operation' *at the site*," in that case the Murphy Site. *Brace*, F.3d at 125 (emphasis in original). Thus, this Court must determine whether the Marsh Site, by itself and based on the activities conducted there, was an established farming operation. The Third Circuit held that Defendants' actions on the Murphy Site—which mirror their actions on the Marsh Site—could only be understood as "convert[ing] a thirty-acre site that was not suitable for farming into a site that is suitable for farming," and thus Defendants "'brought an area into farming use.'" *Id.* at 126. For example, the Third Circuit held that "[e]ven if [Mr.] Brace's father's pre-1975 use of the site for pasturing could be considered to have been a prior, 'established farming operation' on the site, [Mr.] Brace's drainage activities demonstrate that" the exemption does not apply because "a farming operation is not 'ongoing' where 'modifications to the hydrological regime are necessary to resume operations.'" *Id.* at 126 (quoting 33 C.F.R. § 323.4(a)(1)(ii)). As proof, the Third Circuit looked to the fact that "[Mr.] Brace admitted that 'modifications to the hydrological regime,' *i.e.*, drainage of the site through excavating and burying four miles of plastic tubing for drainage, were necessary to grow crops on the site." *Brace*, 41 F.3d at 126.

So too here. It has already been established that wetlands existed on the Marsh Site prior to Defendants' clearing, grubbing, ditching, sidecasting, and installing tile drains. Additionally, Defendants themselves described the Marsh Site as "wet" and "growed up," Randall Brace Dep., Dkt. No. 84-31, 97:21–23, Jan. 10, 2018, and full of standing water, ponding, and trees and shrubs prior to their clearing, Robert Brace Dep., Dkt. No. 84-12, 237:14–20, Jan. 9, 2018. Additionally, Defendants have also admitted to conducting their clearing activities for the *purpose of bringing the Marsh Site into farming*. *See, e.g.*, Todd Lutte Decl., Dkt. No. 84-11 at ¶ 13 ("[o]n July 24, 2012, I visited Mr. Brace's Waterford property . . . [and] Mr. Brace stated that he intended to farm the Marsh Site"); Robert Brace Dep., Dkt. No. 84-12 at 237:21–238:3 ("they said, 'What are you going to do?' I said, 'I want to finish clearing this and cultivate it'"). Therefore, it is clear to the Court that the Defendants' efforts to clear the land and install tile drains were necessary to bring the area into farming use and were thus not part of an established farming operation. *See* 33 C.F.R § 323.4(a)(1)(ii) ("[t]o fall under this exemption, the activities . . . must be part of an established (i.e., on-going) farming . . . operation"). These efforts match those conducted on the Murphy Site and, for the same reason, do not qualify for the normal faming exemption. *See id.* ("[a]ctivities which bring an area into farming . . . are not part of an established operation" and "[a]n operation ceases to be established when . . . modifications to the hydrological regime are necessary to resume operations.").

But, the Third Circuit went further. The Court held that Defendants' installation of tile drains did not qualify under the statutorily defined "normal farming activities." *See Brace*, 41 F.3d at 127; *see also* 33 C.F.R. § 323.4(a)(1)(ii) ("[t]o fall under this exemption, the activities . . . must be in accordance with definitions in § 323.4(a)(1)(iii)" which elaborates on normal farming activities, as listed in § 323.4(a)(1)(i)). As that Court explained,

[Mr.] Brace's undisputed activities: (1) excavating soil and discharging in connection with burying approximately four miles of plastic tubing for drainage; (2) levelling and clearing the formerly wooded and vegetated site; and (3) spreading dredged material, are all excluded from the activities allowed under 33 C.F.R. § 323.4(a)(1)(iii).

*Brace*, 41 F.3d at 127.

In other words, burying drainage tiles failed to meet the definitions of "minor drainage" and "plowing" because minor drainage excluded "drainage associated with the immediate or gradual conversion of a wetland," "conversion from one wetland use to another," and "construction of any canal, ditch, dike or other waterway or structure which drains or otherwise significantly modifies a . . . wetland," 33 C.F.R. § 323.4(a)(1)(iii)(C)(2), and plowing excluded "the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dry land," *id.* at § 323.4(a)(1)(iii)(D), *Brace*, 41 F.3d at 127–28. Same too here, as it has already been established that Defendants similarly cleared, grubbed, and tile drained the Marsh Site.

Thus, the normal farming exemption does not apply.

*b. Maintenance of drainage ditches*

Section 404(f) also provides for an exemption from the permitting requirement for "the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches." 33 U.S.C. § 1344(f)(1)(C). For example, in the Third Circuit case, Defendants claimed that "[Mr.] Brace simply maintained and improved his drainage system, and continued, piece by piece, to farm land which, in one form or another, had always been used for crops or pasture." *Brace*, 41 F.3d at 128.

The Third Circuit was "unpersuaded." *Id.* As that Court explained, "[t]he exemption from the permit requirements under Section 404(f)(1)(C) for 'maintenance of drainage ditches' applies to 'any discharge of dredged or fill material that may result from . . . the *maintenance*

*(but not construction)* of drainage ditches." *Id.* (citing 33 C.F.R. § 323.4(a)(3)) (emphasis in original). Thus, as in that case where that Court held it was "unrealistic to describe" the burying of new tile drains as "continuing maintenance," so too in this case where Defendants also buried new tile drains. *Id.* Therefore, this exemption is also inapplicable.

### c. Recapture

Since the Third Circuit discussed recapture, this Court will as well, briefly, despite finding that neither exemption applies.

The recapture provision of Section 404(f) provides that any discharge "having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject . . . shall be required to have a permit under this section." 33 U.S.C. § 1344(f)(2). Corps regulations further provide that "[a] conversion of a section 404 wetland to a non-wetland is a change in use of an area of waters of the United States." 33 C.F.R. § 323.4(c). The Third Circuit held that "[t]he evidence establishes that [Mr.] Brace's activities drained the site to convert it from a wetland to a new, non-wetland use" and thus recapture applied. *Brace*, 41 F.3d at 129. This Court held the same in this case. *See supra* at 52. Thus, recapture is equally applicable here.

As such, the Court finds that Defendants are liable under Section 301(a) and therefore required a permit under Section 404 to conduct their land clearing activities. Further, none of Section 404(f)'s exemptions apply and, even if they did, recapture would be appropriate under Section 404(f)(2). As such, the Court will grant the United States' motion for summary judgment.

## IV.     THE REMAINING MOTIONS

Having determined that it will grant the United States' motion for summary judgment, both the United States' and the Defendants' remaining *Daubert* motions are moot. Dkt. Nos. 82,

86, and 87.  As such, they will be stricken.

## V.    CONCLUSION

For the foregoing reasons, the United States' motion to exclude undisclosed expert opinion and exhibits and to strike overlength brief is **GRANTED**.  Additionally, the United States' motion for summary judgment on liability is also **GRANTED**.  Finally, both the United States' and Defendants motions in *limine* to exclude expert testimony are stricken as **MOOT**.

IT IS SO ORDERED.

Dated this 12th day of August, 2019.

_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE